## ROBERTS v. MISSOURI AND KANSAS TELEPHONE COMPANY, Appellant.

### Division One, January 13, 1902.

1. **Negligence:** TELEPHONE COMPANIES: LINEMEN: ASSUMPTION OF RISK. A lineman, thirty-four years old, of many years' experience in such employment, with full notice that numbers of cross-arms were unsafe, and charged with the duty and engaged in the work of inspecting and repairing them, voluntarily continued in the hazardous employment of repairing them and of tightening the wires stretched over and above them, and rested his weight upon the cross-arms, manifestly from their size and strength not intended to bear the weight of a person, although the evidence shows that linemen do sometimes do that. No negligence was charged in putting up the cross-arm originally, nor were its defects apparent. Its defective condition was dry rot. He had not, by any of the tests well known to linemen, tested its strength, but put himself on the cross-arm two feet or more from the pole, and it broke, and he fell. *Held*, that he assumed the risk, and can not recover for the injury sustained.

2. ———: ———: CONTRIBUTORY NEGLIGENCE: NOTICE: SAFETY BELT. Before plaintiff went out on the cross-arm to tie a wire to a pin, he observed that the pin, which was of hard wood, was broken and rotten, and from his experience must have known that the cross-arm, which was pine, was also rotten. This was notice of the condition of the cross-arm. He knew it was painted and that the only way to discover its condition was by the tests usually applied by linemen, which he could readily have made. He knew that all linemen were required to have a safety belt, which is fastened around their bodies and the pole to prevent a fall in case the cross-arms break, but he had none. *Held*, that he was guilty of contributory negligence. Nor

can he excuse his negligence in failing to supply himself with a belt by saying he could not from his position two feet from the pole have used the safety belt, which was five feet long.

3. ——: ——: ——: CASE FOR JURY. Where plaintiff's own evidence establishes contributory negligence, there is no disputed fact for the jury to pass upon, and plaintiff should be nonsuited.

4. **New Trial:** APPEAL: REVERSAL. If a verdict for the party in whose favor the new trial was granted, can not be allowed to stand, the appellate court will reverse the judgment of the trial court granting the new trial.

Appeal from Buchanan Circuit Court.—*Hon. W. K. James,* Judge.

REVERSED AND REMANDED *(with directions)*.

*C. A. Mosman* and *Warner, Dean, McLeod & Holden* for appellant.

(1)   Under the evidence in this case, the accident to the plaintiff resulted from one of the hazards and perils ordinarily incident to his employment as lineman.   Where a lineman, thirty-four years old and of many years experience in that calling, with full notice that numbers of the cross-arms on which he is working were unsafe, and, therefore, of the risk he was running in working upon them, voluntarily undertakes or continues in a hazardous employment of this character, or to place himself in hazardous positions, or to work with defective tools or appliances, the employer, this defendant, is not liable for injuries received from these known risks.   Junior v. Electric Light Co., 127 Mo. 79; Steinhauser v. Spraul, 127 Mo. 562; Wray v. Electric Light Co., 68 Mo. App. 387; Thomas v. Railroad, 109 Mo. 199; Nugent v. Milling Co., 131 Mo. 245; McIsaac v. Electric Co., 172 Mass. 89; s. c., 51 N. E. 524; General Electric Company v. Gallagher, 68 Ill. App. 248.   (2)   The evidence of the plaintiff at the trial established a clear case of contributory negligence against him-

self. Under such circumstances, it was the duty of the trial court to pronounce the judgment of the law upon those facts, and nothing was left for the jury. This division of the Supreme Court has recently re-stated the rule in this regard in Davies v. Railroad, 159 Mo. 1. In considering this phase of the case, it should be especially noted that when Roberts attempted to tie the wire on the outer pin, he was acting without any direct order, statement or assurance of any kind whatever from his foreman or his employer, and was under no stress of necessity or haste in the matter. The tests which he could and should have made required but an instant. The following cases amply sustain the defense of contributory negligence. Nolan v. Shickle, 69 Mo. 336; Turner v. Railroad, 74 Mo. 602; Smith v. Railroad, 61 Mo. 588; Wray v. Electric Light Co., 68 Mo. App. 380; Tel. Co. v. Loomis, 88 Tenn. 265; s. c., 11 S. W. 356; Junior v. Electric Light Co., 61 Mo. 84; McGorty v. Telephone Co., 69 Conn. 635; s. c. 38 Atl. 359; Flood v. Telegraph Co., 131 N. Y. 603; s. c., 30 N. E. 196; Anderson v. Inland Telephone & Telegraph Co., 19 Wash. 575; s. c., 53 Pac. 657; McIsaac v. Electric Light Co., 172 Mass. 89, 51 N. E. 524; Bergin v. Tel. Co., 70 Conn. 54, 38 Atl. 888.

*C. H. Harrison* and *Jno. Geo. Parkenson* for respondent.

The master is bound to use ordinary care in providing and maintaining a reasonably safe place in which the servant may do his work. Borrows on Negligence, p. 90; Webb's Pollock on Torts, p. 125, and cases cited; Bailey's Personal Injuries Relating to Master and Servant, sec. 241; Buswell on Personal Injuries, p. 371, sec. 192. And it is the duty of the master to inspect and repair and keep in suitable condition the place of work, instrument and appliances. Borrows on Negligence, p. 95; Bailey's Personal Injuries, sec. 250, et seq. The risks assumed by the servant do not include such as result

from the neglect by the master to perform his duty to the servant. Henry v. Railroad, 109 Mo. 493. In this case it is said that it must be admitted as a general proposition that an employee assumes all the risk ordinarily incident to the service in which he engages. On the other hand, the master implicitly undertakes to use reasonable care to provide his servant with a reasonably safe place in which to work, and suitable and safe instrumentalities with which to perform his duties. The risks assumed by an employee do not include such as result from the neglect of the master to discharge those personal duties to him. Nicholds v. Glass Co., 126 Mo. 66. The fact that the means of knowledge are equal will not defeat a recovery by the servant if the defect was in fact unknown and the ordinary and careful use would not have revealed it; and this, for the reason that it is not the duty of servants to look out for defects, save such as are open to his observation in the ordinary use of the appliance. Guthridge v. Railroad, 105 Mo. 526; Doyle v. Trust Co., 140 Mo. 18. It is the master's duty to his servant to use reasonable diligence in providing for him a safe place to work, and such duty extends not only to such unnecessary and unreasonable risks which are in fact known to him, but such as he might reasonably be expected to know under the facts and circumstances connected with the service. The servant assumes such risks as are reasonably necessary and incident to his employment, as well, also, as such extraordinary and unusual risks as he may see fit to knowingly assume. But he is not required to exercise the same degree of care and diligence in inspecting and investigating the risks to which he may be exposed as the master, but has the right to presume that the master will furnish him a reasonably safe place to work, and when directed by the master or his *alter ego* to perform certain services, he has the right to presume that he will not send him into a place of danger, without assuming the risk of so doing. Gibson v. Railroad, 46 Mo. 169; Telegraph Co. v. Loomis, 11 S. W. 356; Electric Co. v. Kelly, 29

Atl. Rep. 427; Nicholds v. Plate Glass Co., 126 Mo. 55; Edison Co. v. Dixon, 42 S. W. 1009.

MARSHALL, J.—Action for $11,000 damages, for personal injuries received by the plaintiff on September 22, 1898, while in the employ of the defendant, as a lineman. Upon a trial, in the circuit court of Buchanan county, the plaintiff suffered a nonsuit with leave, which that court afterwards set aside, and from which ruling the defendant appealed.

The petition alleges that the defendant, as a part of its plant, has a lead or line of wires in the city of St. Joseph, running from the south part of Eleventh street to and through South Park; that such wires are suspended by cross-arms, attached to poles, about thirty feet high, and placed at intervals of about one hundred feet; that the cross-arms are made of wood, about two and a half inches wide, about four inches deep, and about eight feet long, and are fastened to the poles about twenty feet above the ground; "that this plaintiff was employed by the defendant on said twenty-second day of September, 1898, to fix and securely fasten the wires of said lead to the cross-arms above described, and to tighten the wires on the cross-arms above defendant's where they sagged down upon those of defendant; that in pursuance of his duties on said day, he was negligently ordered to get upon one of said poles and cross-arms on said above-described line or lead in South Park, a suburb of the city of St. Joseph, as aforesaid, by defendant, acting through its foreman and manager in charge of this plaintiff and other men working with plaintiff on this line or lead on said day; that in order to do the act and perform the work required by defendant, plaintiff ascended to the top of said pole and was compelled to stand upon the cross-arm above described of said pole; that said cross-arm of wood had negligently been placed upon said pole in a rotten, unsafe condition and remained there two years or more and was or had negligently been allowed to become rotten, dan-

gerous and unsafe, which was well known to defendant or might have been discovered and known to defendant by the exercise of ordinary care and diligence on its part, but was not known by plaintiff. That this plaintiff, while standing upon the cross-arm as above stated at the direction of defendant and in the performance of his duty, was violently thrown and precipitated to the ground by reason of the said rotten cross-arm breaking and by reason of the negligence of defendant as aforesaid, thereby crushing, mashing and breaking this plaintiff's leg at the ankle."

The answer admits the incorporation of the defendant and that the plaintiff was in its employ as a lineman at the time he was injured; denies generally the allegations of the petition, and pleads affirmatively, first, that the injury was occasioned by one of the hazards or perils ordinarily incident to the employment of a lineman in the defendant's service, and, second, contributory negligence. The reply is a general denial.

The evidence showed the following facts: Plaintiff was thirty-four years old at the time of the accident, and for eight years prior thereto had been working as a lineman for the Western Union Telegraph Company, the Missouri Electric Light Company, of St. Louis, and at different times for the defendant. He was perfectly familiar with the duties of a lineman, and of the risks incident to that work. He knew how to test a pole or cross-arm before going upon it to ascertain whether it was rotten or sound, safe or dangerous. He knew that the life of a cross-arm or a pin in a cross-arm was from six months to six or even ten years; and that they are liable to dry rot, and that no one can tell how long one will last. He had worked on this same line and upon this same pole and cross-arm and had put this same peg or pin in this same cross-arm and strung a wire to it, during the summer immediately preceding the accident. He knew that the tests for ascertaining whether a cross-arm was sound or rotten were

to strike it with a hand axe or with the pliers or to dig into it with a screwdriver, or to drive a screw into it. He admits he made no test whatever of the cross-arm. He says it was painted and appeared to be all right, but because it was painted its condition could only be ascertained by applying one of the tests mentioned. The pole was owned by the city and had only two cross-arms: the top one was short, and carried the electric light wires, the lower one was a ten pin cross-arm, about ten or twelve feet long, and was owned by the defendant. It was mortised and bolted into the pole and projected about five or six feet on each side of the pole. It was made of pine and was three and three-quarter inches in perpendicular dimensions, by one and one-fourth inches in width. The pins or pegs are made of oak or ash, and are set in holes bored through the cross-arm. The wire the defendant had on the pole was called the "police circuit." Several days before the accident the line was reported to be in bad working order, and the plaintiff and J. W. Gates, another experienced lineman, were sent out from the defendant's office, to run over the line, repair it and fix it up so that it would give better service. The plaintiff and all linemen in the defendant's service, and generally in all similar services, were required to supply themselves with the necessary tools to be used as linemen, which usually consisted of a pair of pliers, a screwdriver, climbers, clamps and a safety belt. The safety belt is worn by all linemen and consisted of a belt or strap which went round the waist and the pole, and fastened with "snaps," and was intended to prevent the lineman from falling while at work on the pole or cross-arm, and to enable him to work with both hands. It is from three to six feet long. Gates had all of the above-mentioned tools, including the safety belt. The plaintiff had all except a safety belt. The plaintiff and Gates started to repair and fix up the line. No foreman or superior officer went with them. They worked a day or two before the accident, tightening wires, and doing whatever they found

or deemed necessary to put the line in working order. Among other defects they found, before they reached the pole and cross-arm in question, were three or four cross-arms on other poles that were rotten and dangerous, and these they took out and replaced with new ones which they got from the supply the defendant kept on hand for the purpose. They also tightened up the wires wherever they sagged, as they also did the electric wires wherever they sagged down upon the telephone wires and interfered with the latter wires. When they reached the pole where the accident happened, about eleven o'clock in the morning, the plaintiff climbed the pole first and got above the lower cross-arm, the defendant's, on the north side of the pole, and Gates climbed up the south side of the pole and stopped with his waist at the cross-arm. They found that the electric wire on the top cross-arm sagged down so as to come in contact with the telephone wire on the lower cross-arm. They worked about an hour tightening the wires, and during that time the plaintiff stood upon the defendant's cross-arm, but close up to the pole. Gates got out on his side of the cross-arm and tied a wire and the cross-arm bore his weight, but he was a lighter man than the plaintiff, who was over five feet nine inches in height and weighed over one hundred and fifty pounds. During the time they were at work, the peg or pin to which defendant's wire on the north side of the pole was fastened, where plaintiff was, broke, because of the strain of the wire upon it, which was greater because the wires ran from that pole at an angle. The plaintiff noticed the broken peg and examined it and found that it was rotten. When they had finished tightening the wires, the plaintiff unfastened the wire from the broken peg, and stepped out on the cross-arm *about two feet from the pole* for purpose of tieing the wire to the next peg further out on the cross-arm. When he did so, the cross-arm broke, he was thrown to the ground, and his leg broken. Afterwards it was discovered that the cross-arm was defective, having been af-

fected with the dry rot.    At the close of the plaintiff's case the defendant demurred to the evidence.    The demurrer was sustained, and the plaintiff took a nonsuit with leave, which the court afterwards set aside and the defendant appealed.

## I.

It is not denied in this case, for the law is too well settled to admit of discussion, that it is the duty of the master to furnish to the servant a reasonably safe place and reasonably safe appliances on which and with which to do the work required of the servant, and, conversely, it is equally well settled that it is the duty of the servant to "take ordinary care to learn the dangers which are likely to beset him in the service. . . . He must not go blindly or heedlessly to his work, when there is danger.    He must inform himself. . . . The servant is held, by his contract of hiring, to assume the risk of injury from the ordinary dangers of the employment; that is to say, from such dangers as are known to him, or discoverable by 'the exercise of ordinary care on his part.    He has, therefore, no right of action, in general, against his master for an injury befalling him from such a cause.    His right to recover will often depend upon his knowledge or ignorance of the danger.    If he knew of it, or was under a legal obligation to know of it, it was part of his contract, and he can not, in general, recover."    [Thomas v. Railroad, 109 Mo. l. c. 199; Price v. Railroad, 77 Mo. 508; Steinhauser v. Spraul, 127 Mo. l. c. 562.]

"The servant when he enters the employment of his master assumes not only the risks incident to his employment, but all dangers which are apparent and obvious as a result thereof.    The master is no insurer against all accidents that may overtake or befall the servant in his employ."    [Nugent v. Milling Co., 131 Mo. l. c. 245.]

"If the servant, before he enters the service, knows, or if

he afterwards discovers, or if, by the exercise of ordinary observation or reasonable skill and diligence in his department of service, he may discover, that the building, premises, machine, appliance or fellow-servant in connection with which or with whom he is to labor, is unsafe or unfit in any particular, and if, notwithstanding such knowledge, or means of knowledge, he voluntarily enters into or continues in the employment without objection or complaint, he is deemed to assume the risk of the danger thus known or discoverable, and to waive any claim for damages against the master in case it shall result in injury to him." [2 Thompson on Neg., 1008.]

In Steinhauser v. Spraul, 127 Mo. l. c. 562, it was said: "Again, no principle is more frequently enunciated, or more often applied in the adjudicated cases, than that which holds that an employee, in engaging in the service of another, assumes the risks incident to such employment, and this is especially true of seen dangers and patent defects. Where ordinary inspection and carefulness will enable the employee to avoid the danger, there he will be required to use such inspection and carefulness. 'But it is held that, wherever the employee's means of information are equal to or greater than those of his employer, the employer will not be liable in case of injury from a defect of that sort. But this is, perhaps, little more than to say that the servant, as well as the master, is bound to ordinary care. For patent dangers or defects, the master, as a rule, is not liable, and in many cases it has been held that they need not be pointed out, even to minor employees, if the latter be capable of discerning them.' [Beach on Contrib. Neg. (2 Ed.), sec. 359."]

In Junior v. Electric Light Co., 127 Mo. l. c. 83, it was said: "The facts in this case bring it within the familiar principle that if a servant, capable of contracting for himself, and with full notice of the risk he may run, voluntarily undertakes a hazardous employment, or to place himself in a hazardous position, or to work with defective tools or appliances, the

master is not liable for injuries received from these known risks."

The case of Flood v. Western Union Telegraph Co., 131 N. Y. 603, is peculiarly apposite to the case at bar in its essential features.    In that case the New York Court of Appeals, speaking through EARL, C. J., said:    "The plaintiff seeks to enforce liability upon the defendant for the death of the intestate because of its negligence as to the cross-arms which broke under his weight.    We have carefully read and weighed the evidence contained in this record and are unable to find any showing of culpable negligence adequate to sustain this judgment.

"The defendant did not insure the safety of its employees.    It was bound only to use reasonable and ordinary care to provide for them a safe place to do their work, and they assumed the ordinary risks of the employment in which they were engaged.    The cross-arms on telegraph poles, manifestly from their usual size and strength, are not intended to bear the whole weight of any person, and yet the evidence shows that persons engaged in fixing them and placing wires upon them, do sometimes rest their weight upon them.    It must always be a hazardous venture for a man to sit on the outer end of one of these cross-arms engaged in pounding near the end with a hammer.    When the arm is new and perfect this may be done with safety.    But it must always be attended with great danger, and it is unnecessary, as the work can be done without resting the whole weight upon the arm.

"There was no negligence in furnishing and putting up this arm originally.    It was of the material and of the size and apparent strength and safety then in use by all telegraph companies, and, so far as appears, such arms have been found adequate for every purpose.    For some time before the accident the defendant had been using larger and stronger arms to carry heavier wires, and only for that purpose.    There was a system of inspection for the arms when purchased, and it does

not appear that there was anything in the external appearance of this arm, when new, which indicated any defect or weakness, or that there was any defect therein discernible by any ordinary inspection.

"This arm had been in use for about six years, and during all that time had perfectly answered its purpose. There was no proof showing how long such an arm ought to last or be used. The defendant had a system of inspection which appears to have been all that was practicable. Its inspectors went along the line of telegraph poles and wires, and carefully looked at them and tried the poles to see if they were still strong and adequate. They were provided with arms so that if they discovered any that were insufficient they could replace them. They were not expected to climb up every pole and examine the arms thereon. Such an inspection would be manifestly impracticable and unnecessary. The linemen all discharge their duties in the daytime. They have frequent occasion to climb the poles and work about the arms, and obviously they are the persons who are expected to see the condition of the arms, and if they find them insufficient to replace them, or to report the fact. It is the obvious duty of every lineman, before going upon one of these arms, many feet above the earth, to inspect it for his own safety."

The case of Bergin, Admr. of Delaney, v. Southern, etc., Telephone Co., 70 Conn. 54, is also very similar to the case at bar. In that case it was said: "Delaney was an experienced lineman, acquainted with the duties and dangers of his employment. As against the telephone company, his negligent failure to perform one of the duties of his employment must defeat a recovery for an injury caused by such failure.

"The relation of Delaney to the Electric Railroad Company was different. As he was not their employee, he was under no contract duty to test their wires or circuit breakers. Under different circumstances he might have assumed that the electric company was performing its duty, and using suitable

and safe appliances to prevent the escape of electricity from the main, or trolley wire, to the guy wires. But when the accident happened he knew, as an experienced lineman, that such was not the fact, and that it was unsafe to act upon such a belief. He had been expressly warned of the danger 'of a contact with wires of this kind. Two instances upon this same work, of damages caused by the escape of electricity to the telephone wires by reason of defective circuit breakers, had been called to his attention, and a fellow-workman but a day or two before this accident pointed out to him this particular guy wire as one from which he had himself just received a shock. With such knowledge and after such warning Delaney heedlessly pulled the wire, which he was coiling, from the arm of the telephone pole, in such a manner that it would obviously fall, as it did, upon the guy wire, and when, as the court finds, it would have been easy for him to have thrown the wire from the pole so as to avoid contact with the dangerous guy wire.

"The defendant Electric Railroad Company can be only liable in this action for an injury caused by its negligence, to one who was himself in the exercise of ordinary care. Its negligence did not excuse Delaney from exercising such care to avoid an injury. Applying that test to the conduct of Delaney, namely, the care which a person of ordinary prudence and judgment should have exercised under similar circumstances— and we have no reason to think any different standard was applied—the trial court has found that he was not in the exercise of due care, as alleged in the complaint, and that his negligence essentially contributed to cause his injury. This conclusion of the court is final."

There is not a particle of evidence in this record to sustain the allegation of the petition that the work was being done under the direction of defendant's foreman, or of any superior officer. The plaintiff and Gates were alone and were sent to repair the line and fix it up. They were left free to adopt

what measures they saw fit to accomplish the purpose. Neither is there any evidence to support the contention of the plaintiff, that his duties as a lineman did not require him to examine or inspect the cross-arms to see if they were safe before he rested his weight on them. On the contrary, whether such duties ordinarily attach to the business of a lineman or not, the plaintiff in the performance of the work of repairing and fixing up the line, was expected to and did inspect and repair the whole line, the poles, cross-arms and pins as well as the wires, and his testimony shows that he so understood it, for he says that he and Gates had discovered three or four cross-arms that were rotten or dangerous and had taken them out and replaced them with new cross-arms, which they obtained from the stock the defendant kept on hand for that purpose. The plaintiff, therefore, was not only acting as a lineman, but was also an inspector as to this work. He was engaged in the work of repairing the line. It was his duty to look for defects and to remedy them. He had no right to assume that the defendant had previously and properly inspected the line, for if it had it would have known of the defects and have directed the plaintiff and Gates what defects existed and what they should repair.

This case is clearly distinguishable from the cases cited and relied on by the plaintiff, in this, that in those cases the servant injured was not charged with the duty of ascertaining and repairing the defects in the appliances, but was using appliances furnished him by the master for use in the ordinary course of his employment, while in this case the plaintiff was charged with the duty and engaged in the work of inspecting and repairing the master's appliances.

The plaintiff therefore assumed, by his contract of employment, all the risks incident to the performance of the work upon which he was engaged. The accident was caused by one of those risks. The plaintiff, therefore, has no claim against the defendant.

In addition, the plaintiff was a skilled lineman of over eight years' experience. He knew that cross-arms rot in from six months to ten years, and that no man can foretell how long any particular cross-arm will last. He knew all the tests—which were very simple—for ascertaining whether a cross-arm was sound and safe or not. Yet he did not apply a single test to this cross-arm before putting his weight upon it. He knew it was painted and that any defect in it could no be discovered by the eye, but could only be ascertained by one of the usual tests. Yet he did nothing to find out its condition before he went out on it. He knew that all linemen wear a safety belt, which they furnish themselves and which the company did not furnish, and yet he had none, and used none. He knew the purpose of a safety belt was, partly, to prevent a fall if the cross-arm broke, and yet he used none. He seeks to excuse this neglect of his own safety by saying he could not have used it when he went out on the cross-arm. But he is manifestly mistaken in this regard, for he says the safety belt was five feet long, and he only went out two feet onto the cross-arm. He was put to notice of the condition of the cross-arm before he went out on it, for he saw that the pin, which was made of oak or ash, a hard wood, was broken and rotten, and he knew that if the pin was rotten the probability was that the cross-arm, which was made of pine, a soft wood, was also rotten. Yet he took absolutely no precautions for his own safety. His knowledge and means of knowing the condition of the cross-arm was not only equal but superior to the knowledge and means of knowledge of its condition by the master. He was on the spot; the master was in town in the office. Upon this showing, it is plain that the risk was assumed by the plaintiff, and also beyond dispute that the plaintiff's own negligence contributed directly to the happening of the injury, and that he is not entitled to a judgment against the defendant. Ordinarily the question of contributory negligence is one for the jury, but where the plaintiff's own case clearly establishes

contributory negligence, there is no disputed fact for the jury to pass upon, and the matter is one of law.   [Hudson v. Railroad, 101 Mo. 13; Milburn v. Railroad, 86 Mo. 104; Schlereth v. Railroad, 96 Mo. 509; Stone v. Hunt, 94 Mo. 475; Buesching v. Gas. Co., 73 Mo. 219; Evans & Howard Fire Brick Co. v. Railroad, 21 Mo. App. 648; Warmington v. Railroad, 46 Mo. App. 159.]

In Haven v. Railroad, 155 Mo. 216, it was held that this court will not reverse the ruling of a trial court in granting one new trial, unless no verdict in favor of the party at whose instance the new trial was granted could be allowed to stand. [Ibid. l. c. 229.]   This case falls within the exception to the rule stated.

For those reasons the judgment of the circuit court setting aside the nonsuit is reversed and the cause remanded to that court with directions to overrule the motion to set aside the nonsuit.

All concur.