FRANK W. RUTLEDGE, Respondent, v. E. F. SWINNEY and W. H. POWELL, Receivers of the SEDALIA LIGHT & TRACTION COMPANY, a Corporation, Appellants.

Kansas City Court of Appeals, April 7, 1913.

1. **NEGLIGENCE: Electric Light Poles: Master and Servant.** The plaintiff sued to recover damages for personal injuries sustained by a fall from the top of one of the defendant's electric light poles. The plaintiff was employed as a line man, and was one of a gang of men assigned to the work of replacing a large transformer for an older and smaller one, on the top of an electric light pole. While the plaintiff was loosening the rope with which the new transformer had been hoisted to the top of the pole, one of the cross arms broke and he fell to the sidewalk and was injured. There was evidence that it was the duty of the foreman to ascertain the condition of the poles before allowing the men to work thereon. *Held,* that the plaintiff was entitled to have the jury decide whether or not a negligent breach of his master's duty towards him was the sole cause of his injury.

2. ————: ————: **Cross-Arms: Support.** The use of a cross-arm by a lineman as an aid to pole climbing or as a place of support where such use is necessary to the proper discharge of a duty of his service, is not negligence.

3. ————: ————: **Assumed Risks: Hidden Defects.** The risks of injury from defects that will escape detection under a reasonably careful inspection are risks assumed by a lineman as a part of his contract of employment. But defects open to discovery by the exercise of reasonable care cannot be classed as assumed risks.

4. ———: ———: Inspection. When a company includes in the duties of its linemen that of making his own inspection and of using his own judgment in determining the question of whether or not it would be safe to climb a given pole, then the lineman assumes the risk of injury arising from the natural decay of the poles and their appliances as inherent risks of the employment.

5. INSTRUCTION: Prejudicial Error. An instruction, which assumes as proved, the question, whether or not the plaintiff had the means and time for making a comprehensive inspection and as a lineman having such opportunity, was bound by the duties of his employment to make such inspection. is erroneous.

Appeal from Pettis Circuit Court.—*Hon. H. B. Shain,* Judge.

REVERSED AND REMANDED.

*G. F. Longan* and *Seddon & Holland* for appellants.

(1) The court should have given the peremptory instruction asked by appellants at the close of the evidence: Because the petition does not state that the cross arm and pins referred to in the petition were furnished for the purpose of bearing the weight of linemen. York v. Railroad, 117 Mo. 405; Sindlinger v. City of Kansas, 126 Mo. 315; Kelly v. Lawrence, 195 Mo. 75; Roberts v. Telephone Co., 166 Mo. 369; Telegraph Co. v. Speicher, 59 N. J. L. 23. (2) Because the testimony showed that the cross arm and pins in question were not furnished for the purpose of bearing the weight of linemen. (3) Because it was the duty of respondent to make his own inspections and the evidence in this case, shows he made none. Smith v. Light & Power Co., 143 Mo. 572; Forbes v. Dunavant, 198 Mo. 193; McIsaacs v. Electric Light Co., 172 Mo. 89; Flood v. Telegraph Co., 131 N. Y. 603; McGorty v. New England Tel. Co., 69 Conn. 635.

*Chales E. Yeater* and *Montgomery & Montgomery* for respondent.

(1)   It is not necessary for a recovery by plaintiff to either plead or prove that the cross arms and pins were furnished for the purpose of bearing the weight of linemen.   The petition alleges that this cross arm was defective, and a part of the place where plaintiff had to work and that by reason of defendant's negligent failure to inspect the same and make the place safe plaintiff while there working was injured.   Under the facts and circumstances in evidence it was impossible for plaintiff to reach the pole and it was necessary for him to steady himself by placing his hand on the cross arm and thus keep his balance, in order to avoid falling, while he removed his safety belt so as to ascend the pole, and such would have been the case with any lineman undertaking to climb this particular pole, and consequently this pole was not a safe place at which to work with the defective cross arm, and this very issue of fact was fairly put to the jury by defendants' instruction 8 and determined by the verdict for the plaintiff.   McDonald v. Postal Tel. Co., 46 Atl. 407; Brimer v. Railroad, 109 Mo. App. 493; Palmer v. Kinloch Tel. Co., 91 Mo. App. 107; Winscott v. Railroad, 151 Mo. App. 378; Woods Admx. v. Railroad, 104 Va. 650, 52 S. E. 371; McIntyre v. Railroad, 163 Mass., 189, 39 N. E. 1012; Rigsby v. Oil Well Supply Co., 115 Mo. App. 308; Lee v. Railroad, 112 Mo. App. 372; Porter v. Railroad, 71 Mo. 77, et seq.   (2)   The law does not impose a comprehensive inspection for hidden defects of the place where he is to work upon the servant working under a foreman, and the doctrine applied thereto of equal or better opportunity in defendants' refused instruction 5 has been repeatedly denied in this State, and expressly in the recent Corby case.   Nicholds v. Plate Glass Co. (Banc), 126 Mo. 65; Porter v. Railroad,

71 Mo. 78 and 79; Epperson v. Postal Tel. Cable Co., 155 Mo. 526; Corby v. Mo. & Kan. Tel. Co., 231 Mo. 436 and 437; Lee v. Railroad, 112 Mo. App. 403; Doyle v. Trust Co., 140 Mo. 18.

JOHNSON, J.—Plaintiff, the servant of defendants, received personal injuries while in the discharge of duties pertaining to his employment and sued to recover the resultant damages on the ground that his injuries were caused by negligence of defendants in failing to exercise reasonable care to furnish him a reasonably safe place in which to work. The answer is a general denial and a plea of contributory negligence. The cause is here on the appeal of defendants from a judgment for $5000 recovered by plaintiff in the circuit court.

Defendants, as the receivers of the Sedalia Light & Traction Company, were engaged in the business of manufacturing and selling electricity for lighting and heating purposes in the city of Sedalia. High power currents of electricity were transmitted over pole lines owned and maintained by defendants and at certain places such currents were run into transformers where they were divided into numerous weaker currents, each of which was thence transmitted to its place of consumption. One of these transformers was on a pole at the northwest corner of Second street and Vermont avenue. The pole was thirty feet high and carried four cross arms near the top. The first three from the bottom were attached to the west side of the pole and faced west. The top or "buck" cross arm was attached to the south side of the pole and faced south, which position placed it at right angles to the other three. The first cross arm was nineteen feet eight inches above the sidewalk and carried two electric light wires on the pins next the pole. The second was two feet four inches higher and had four vacant pins. It carried the transformer which was cylindrical

in shape, weighed 150 pounds and was on the west side of the pole. The third cross was six feet higher and carried two high power wires connected with the transformer by "jumper" wires which were close to the pole and ran down its east side into the transformer. The buck arm was eight or ten inches above the last mentioned cross arm. A "secondary" light wire ran up the pole into the transformer from the bottom cross arm where it was attached to the pole pin.

Defendants had found it necessary to replace the transformer on this pole with one of larger capacity and their superintendent, on the day of the injury, ordered the foreman to "take the boys down and change that transformer . . . if you have time to get through with it," which meant that the change should be made without interfering with the service to consumers. To complete the work that day required haste and the foreman, in ordering the men to do the work, told them "we have got to hurry so as not to interrupt the service of consumers."

Plaintiff was one of the workmen the foreman took with him. He was an experienced lineman and it was his task to climb to the top of the pole and do the work there necessary to effect the substitution. The new transformer was thirty-four inches long, in the form of a cylinder, eighteen inches in diameter at the top and weighed 250 pounds. The pole leaned slightly towards the east and plaintiff climbed upon its west side. He carried a block and falls which, with its ropes, weighed fifty pounds, and only such tools as he needed in making the change. He wore spurs and a safety belt. The insulation of some of the wires strung on the pole was in a defective condition and he was compelled to avoid contact with such wires. He climbed to the top of the old transformer and stood on it while he lashed the hoisting apparatus to the third cross arm. He testified that in going up the

pole he carefully looked at the cross arms and observed no sign of decay or weakness in them. He noticed that the buck arm was new and evidently had been recently put on. Further he noticed that the insulation of the jumper wires was defective and that he would have to be careful to avoid them. He descended over the transformer to a point which brought his shoulders on a level with its top. His weight rested on his spurs and he put his safety belt around the pole. He had already attached the hoisting rope to a ring in the top of the transformer and on assuming the position just described called to the foreman to "let her ride" which meant that the men below should raise and unhook the transformer from the cross arm and lower it to the ground. This was done and the new transformer which, as stated, was larger and heavier than the old, was hoisted and hooked onto the cross arm in the place of the old. After completing this task plaintiff started to climb to the top of the transformer to unloose the block and falls from the third cross arm. He concluded that the transformer was too large an obstacle to climb over and after detaching the safety belt from the pole proceeded to climb around the north side of the transformer. He leaned over towards the north and with his left hand seized the second cross arm (the one to which the transformer was attached), at a point about in the middle of the arm. The wood looked sound but had rotted in the interior and the shell crumbled under his grasp and he started to fall. To save himself he grasped the pole pin with his right hand but it broke off under the surface of the cross arm. Still falling he clutched the end pin with his left hand but it split the end of the rotten cross arm and pulled out. He fell to the sidewalk sustaining the injuries which are the subject of this controversy.

One of the most important conflicts at the trial was over the subject of the method defendants had

adopted and applied for the performance of the elementary duty they owed their linemen of exercising reasonable care to furnish them a reasonably safe place in which to work. The substance of the evidence of defendants is that cross arms and pins were not intended to be used by linemen for purposes of climbing and support and that when linemen were sent out to work on poles they were charged with the duty of making their own inspection. The evidence of plaintiff is to the contrary and since the jury resolved all controverted issues of fact in favor of plaintiff and the principal questions we are called upon to determine arise from the contention of defendants that plaintiff failed to make a case to go to the jury, we shall confine our consideration of the evidence to its phase most favorable to the pleaded cause of action.

The method of work followed by defendants thus is described in the evidence of plaintiff. Ordinarily when work was being done at the top of a pole it was the duty of the top man to make such inspection of the cross arms, pins, wires, etc., as his opportunity reasonably afforded and to report to the foreman any defects discovered by him, but the foreman himself was charged with the duty of inspecting the plant and of making such repairs as the superintendent would order him to make. Generally the foreman accompanied the linemen sent out to make repairs or replacements and directed their activities. In such instances a lineman who ascended a pole would not stop to inspect it but would rely on the express or implied assurance of the foreman that it was safe for him to climb the pole. On occasions when the foreman, for some reason, such as illness, did not go with men, the superintendent, so plaintiff states, outlined the work and told plaintiff ''what he was to look out for.'' At times, but not frequently, plaintiff was sent

out to work alone under directions to make his own inspections and use his own judgment but the sum of all the evidence of plaintiff on the subject of inspection is that the foreman was the inspector and that when he was in charge of a repairing gang, the top man was not expected or permitted to do inspection work except at the top to discover defects that would not be observable from the ground. As stated the work in question was ''a rush job'' performed under the eyes of the foreman. The tools he ordered plaintiff to take did not include tools for testing wood to discover the presence of internal decay. The foreman knew plaintiff could not discover such defects in the cross arms and in ordering him to the top of the pole without warning him of the presence of such defects the foreman, in effect, assured him that the place was reasonably safe. This assurance was confirmed by the appearance of the buck arm which disclosed that it had been put on recently and, therefore, indicated that the lineman who had done that work had inspected the cross arms for internal decay and had found them sound.

After the injury of plaintiff the foreman climbed the pole to detach the hoisting apparatus from the third cross arm. When he reached the transformer he did not attempt, as plaintiff had done, to go around it but climbed over it and stood on its top while he unloosed the fastening. Much stress is laid on this fact by counsel for defendant who insist that plaintiff was guilty in law of contributory negligence in choosing a dangerous course in preference to a safer one. But we think the issue thus raised was one of fact for the jury to solve. Obviously an obstacle of the dimensions and shape of the transformer was most difficult to surmount. The safety belt could not be used and the support of the spurs had to be abandoned while the climber drew himself over the cylinder. Expert climbers must differ in strength, agility, confi-

dence and courage and the inference is reasonable that plaintiff in attempting to swing around the transformer, selected the only possible course, that could be followed in safety by a lineman of ordinary attainments. Foremen usually are selected on account of their superior ability, skill and judgment and it would not be a fair rule to hold as a matter of law that an ordinary workman must equal his foreman in proficiency. The legal question in all such cases is this: Did the injured workman act with the care and prudence that should characterize the conduct of an ordinarily careful and prudent workman in the given situation? If he did he should not be called negligent because he failed to measure up to a higher standard of efficiency.

Counsel for defendant further argue that cross arms and pins are placed on poles not to carry human weight but to support wires, cables and other equipment and, therefore, that it was negligence *per se* for plaintiff to put them to a use for which they were not intended. And in addition argue that if linemen were in the habit of making such improper use of cross arms and pins the attendant risks of injury were natural risks of the employment assumed by them. Imbued with this theory of the case counsel further contend that the petition is fatally defective because "there is no allegation that the cross arms and pins were designed or intended to bear the weight of linemen and no allegation that they were not reasonably safe for the purposes for which they were designed or intended."

This argument, so far as it relates to plaintiff's use of the pins may be dismissed with the observation that plaintiff did not attempt to use them as an aid to his ascent. He was in the act of falling when, like a drowning man grasping at straws, he clutched, in desperation, at anything that came within his reach. A person in imminent danger of great bodily injury

cannot be condemned for acting on the natural impulses of the instinct of self-preservation.

In support of the argument that plaintiff was making an improper use of the cross arm and was injured either by his own negligence or by one of the inherent risks of his employment, defendants greatly rely on the decision of the Supreme Court in Roberts v. Telephone Co., 166 Mo. 370, wherein it is said (p. 380):

"The defendant did not insure the safety of its employees. It was bound only to use reasonable and ordinary care to provide for them a safe place to do their work, and they assumed the ordinary risks of the employment in which they were engaged. The cross arms on telegraph poles, manifestly from their usual size and strength, are not intended to bear the whole weight of any person, and yet the evidence shows that persons engaged in fixing them and placing wires upon them, do sometimes rest their weight upon them. It must always be a hazardous venture for a man to sit on the outer end of one of these cross arms engaged in pounding near the end with a hammer. When the arm is new and perfect this may be done with safety. But it must always be attended with great danger, and it is unnecessary, as the work can be done without resting the whole weight upon the arm."

There is nothing in that decision that denounces as negligence in law the use of a cross arm by a lineman as an aid to pole climbing or as a place of support where such use is necessary to the proper discharge of a duty of his service. Concede that the primary purpose of cross arms is not to support human weight; neither is the primary object of a telephone or electric light pole to bear such burdens. But in the installation and maintenance of pole lines, poles must be climbed and cross arms must be and always have been used by linemen as means of support.

Rutledge v. Swinney.

In this instance the foreman, when he unloosed the block and falls from the third cross arm, stood on the transformer which was supported by the very cross arm that further out from the pole had shelled off in plaintiff's hand. We have already shown that plaintiff was compelled to use the cross arm to ascend to the top of the transformer. It would be a strange rule and one not recognized in any of the cases in this State that would allow a master to send a servant into a place of work and absolve him from the duty of exercising reasonable care with respect to the means of access he knew the servant would be compelled to use for the reason, forsooth, that such instrumentalities were not primarily intended for such use. Defendants must be held to have known that plaintiff would be compelled to follow the course he was pursuing when he fell and plaintiff cannot be held negligent in law from the mere fact that he attempted to use the cross arm in making his ascent.

The duty was on defendants to exercise reasonable care to provide plaintiff with a reasonably safe cross arm and if we should find that the evidence of plaintiff shows that a negligent breach of that duty was the sole cause of the injury there would be no place in the case for the application of the rule of assumed risk. It is a matter of common knowledge that wood sometimes will become weakened by internal decay the presence of which will escape detection under a reasonably careful inspection. Risks of injury from such defects were risks assumed by plaintiff as a part of his contract of employment but defects open to discovery by the exercise of reasonable care cannot be classed as assumed risks and since the evidence of plaintiff tends to show that the defect in question would have been discovered had reasonable care been exercised the issue of assumed risk, so far as the consideration of the demurrer to the evi-

dence is concerned, must be treated as settled adversely to the position of defendants.

The whole case finally turns on the question of whether or not the duty of inspecting the cross arm in this instance could have been and, in fact, had been imposed by defendants, the masters, on plaintiff, the servant. It is argued by defendants that it had and, consequently, that the injury was the direct result of the breach by plaintiff of one of the duties of his employment. As is said by the Supreme Court in Corby v. Telephone Co., 231 Mo. l. c. 436: "The law of master and servant applies as well to telephone companies and their servants as it does to all masters and their servants. There is no exception to this rule, that we know of, which requires the master to furnish the servant with a reasonably safe place in which to labor." And further the familiar rule is applied in that case that the master cannot escape his burden by shifting it to the shoulders of his servant. Counsel for plaintiff seem to think that we expressed the view in Miller v. Telephone Co., 141 Mo. App. 462, that the service of a telephone lineman was controlled by different rules from those usually pertaining to the relation of master and servant, but this is an erroneous view of that decision. We held that in cases where the company included in the duties of its linemen that of making his own inspections and of using his own judgment in determining the question of whether or not it would be safe to climb a given pole that the linemen assumed the risks of injury arising from the natural decay of the poles and their appliances as inherent risks of the employment, but we assumed as a matter of course that a telegraph or telephone company owed its servants the duty of reasonable care to furnish them a reasonably safe place in which to work. But to make safe an unsafe place requires that some one must inspect and repair the defective place and the rule is well settled that a servant employed to do

that kind of work assumes the risks of injury that inhere in the defects he is employed to discover and remedy. We held in the Miller case that a lineman might be employed in the dual capacity of making unsafe places safe and of working in them after he had made them safe; that the company was not compelled "before sending a lineman to work on a pole which has been in service long enough to be affected by decay to send another servant to inspect the pole, but ordinarily" (i. e. in cases where he sends the servant out with full authority to use his own judgment) "is justified in relying on the lineman making his own inspection." We found in that case that the company had not imposed the duty of inspection on the lineman and had committed a breach of its duty of reasonable care to furnish him a reasonably safe place in which to work.

The same view of the law is expressed in the Corby case as will appear in the following quotation: "Of course, as before suggested, where two or three linemen are sent out on an equal footing along a telephone line to inspect and make such repairs of defects in the poles and wires as they may discover, or which may have been pointed out to them, the master would not be liable to any of them for injuries sustained in consequence of said defects for the obvious reason that they would be representing both the company and themselves in such matters and would be executing the work according to their own plans, knowledge and judgment, and not under the supervision, orders and directions of a foreman representing the master. In such a case, strictly speaking, the relation of master and servant does not exist—the so-called servant, while he is an employee, being his own boss and not under the charge of nor subject to the orders or control of the employer, nor has he the right to assume that the employer will inspect the premises or that the place to be furnished him in

which to work will be reasonably safe, for the reason that he was employed for the express purpose of making the inspection and repairing all defects discovered by him, or pointed out by others.''

Applying the rules announced in these cases to the facts before us we must hold that the evidence of plaintiff supports his pleaded cause of action. He was sent up the pole by the vice principal of defendants under circumstances that deprived him of the means and opportunity of inspecting the cross arm for latent defects. Presumably the pole and its attachments had been recently inspected and found to be in good condition and in ordering him to the top to do a rush job and knowing that he had neither the means nor time for a comprehensive inspection, the orders and actions of the foreman told him as plainly as words could have told him that the cross arm was reasonably safe for the use the foreman must have anticipated he would make of it. The case is analogous in principle to the Miller case and we hold as we did in that case that plaintiff sustained his burden of proof and was entitled to go to the jury on the issue of whether a negligent breach of his master's duty towards him was the sole cause of his injury. The demurrer to the evidence was properly overruled.

We find prejudicial error in the instructions given at the request of plaintiff. The evidence as a whole discloses a sharp controversy over all of the constittutive facts of plaintiff's cause of action. The evidence of defendants tends to show that plaintiff had sufficient tools and ample time to make the necessary inspection of the cross arm; that the foreman had to depend on the reports of top linemen for information respecting hidden defects in cross arms and that plaintiff was charged with the duty of inspecting that cross arm while at the top of the pole. We may summarize the evidence of defendants by saying it discloses that

Rutledge v. Swinney.

plaintiff, when at the top of the pole was in a place where he was left free to use his own judgment and where, to borrow an expression from the Corby case he was "his own boss and not under the charge of nor subject to the orders or control of the employer." In defendants' view of the facts the foreman's presence at the foot of the pole was not the presence of the master at the top. There plaintiff. was supreme—was, in fact, his master's vice principal charged with the duty of inspecting the cross arm for invisible defects and the foreman, for all practical purposes as well might have been in China as at the foot of the pole. In view of this wide divergence in the evidence it was error for the court to tell the jury as it did that without condition or qualification "it was not the duty of the plaintiff on his own motion to make a comprehensive inspection of said pole and the attachments thereon to detect dangers . . . that all that was required of plaintiff on said occasion was that he use his senses in the position assigned him and . . . that as to dangers if any not to him apparent, and not inherent to the employment (which latter are such as the defendants could not discover in the exercise of ordinary prudence by the ordinary tools used for inspection) the plaintiff had a right to rely on the judgment of his employers for the safety of his position."

The instructions assumed as proved plaintiff's version of the contested and most important issues of fact in the case, viz., whether or not plaintiff had the means and time for making a comprehensive inspection and as a lineman having such opportunity was bound by the duties of his employment to make such inspection.

For this error the judgment is reversed and the cause remanded.

All concur.