## JOSEPH WEIDEN v. THE BRUSH ELECTRIC LIGHT COMPANY.

*Master and servant—Negligence—Duty of employé as to obeying orders of foreman—Evidence.*

In this case it is *held:*

1. That if it was plaintiff's duty, as seems to be conceded, to trim lamps under the direction of defendant's foreman, who ordered plaintiff to ascend the tower for that purpose, or to see if the lamps had been trimmed, it was his duty within his employment to obey the order, and that it can make no difference whether the lamps had been trimmed the day the order was given or not.

2. That there was no competent evidence that any examination had ever been made by defendant of the tower and cable where the injury was received; and that if the jury believed that defendant's superintendent was notified of their defective condition, as testified by defendant's employés, the defendant was guilty of negligence, there being no proof that any attention was paid to such notice.

Error to Wayne. (Reilly, J.)   Argued October 5, 1888. Decided January 18, 1889.

Case.   Defendant brings error.   Affirmed.   The facts are stated in the opinion.

*Marston, Cowles & Jerome,* for appellant.

*Thomas Hislop,* for plaintiff.

MORSE, J.   The plaintiff alleges in his declaration that the defendant is a corporation, organized and doing business under the laws of this State within the city of Detroit; that said business is the constructing, operating, and maintaining of a system of lighting apparatus, used in lighting the city of Detroit, by means of electricity,

conducted and maintained by wires, posts, and towers; that, among others, a tower, with elevator and cable therein, is at the corner of Jefferson and Woodward avenues; that plaintiff was an employé of defendant, whose employment was to transfer lines from one pole to another, connect lines for conveying electricity, and generally to do the work of a "line-man."

It avers that it became the duty of the defendant, in conducting its business, to use proper precaution in the construction of its towers, and elevators and cables therein, and to so construct the same, with materials of sufficient strength and durability, that said towers, and elevators and cables therein, would not break while being used by its employés; to use proper care in keeping said towers, and the elevators and cables therein, in good working order, and by testing, watching, and supervising said cables and elevators, and repairing them, prevent them from becoming weak or rotten from exposure, and thereby liable to break; so that its employés could with safety ascend or descend the towers by means of said elevators, as became necessary while in the performance of their work and duty.

The declaration further alleges that the defendant so negligently conducted itself by failing and neglecting to exercise such due and proper caution in constructing said towers, and elevators and cables therein, of materials of sufficient strength and durability to enable its employés to ascend or descend said elevators without danger from said elevators or cables breaking; by failing and neglecting to test, watch, and supervise said cables and elevators, and to keep them in repair, and to prevent them from becoming weak, rotten, and unsafe from exposure to the weather; by negligently permitting the cable of the elevator at the corner of said Jefferson and Woodward avenues to become weak, unsafe, and liable to break when used

by its employés; and by negligently causing or permitting said elevator to be used by the plaintiff, while the said elevator was in a defective and unsafe condition by reason of the cable thereof being weak, unsafe, and liable to break, and known so to be by said defendant,—that while said plaintiff, on February 11, 1887, was ascending said tower in said elevator, by order of said defendant, ignorant of any defect or weakness in the cable of said elevator, and in the exercise of due care on his part, and by reason of the neglect and want of care of the defendant's employés, officers, agents, and servants, the cable of said elevator in said tower broke, which caused said plaintiff to fall down said tower a distance of 70 feet, from which said plaintiff was cut, bruised, and injured, etc.

The plea was the general issue. Verdict and judgment in Wayne county circuit court for $750 damages in favor of plaintiff. The case comes here for review upon the charge of the court to the jury.

A brief statement of the admitted and controverted facts seems necessary to a correct understanding of the points involved in the assignment of errors.

The defendant corporation lights the city of Detroit by electricity. This light is thrown out from the tops of high poles or towers, the current being carried to these tops by wires running from the place where the electricity is generated. There are lamps set or hung on these tops, and it is necessary to trim them every day. This is done by going up an elevator in the center. The elevator consists of a box or cage, at the lower end of which is a wire cable running to the top of the tower, and at the top passes around a wheel with a groove inclosing the cable. At the other end there is a heavy weight for the purpose of assisting the workmen in reaching the top.

The plaintiff was in the employ of the defendant on

February 11, 1887, and started to go up this tower on the corner of Jefferson and Woodward avenues, in the elevator. When up about 50 or 60 feet the cable broke, and he fell down with the elevator, and was injured. So far there is no dispute as to the facts.

It is claimed on the part of the plaintiff, further, that he was sent to this tower by the superintendent of the defendant corporation, in company with, and subject to the orders of, one Tom Fitzgerald, foreman; that he went up and trimmed the lamps on the tower at the post-office without any trouble. When they came to the tower in question Fitzgerald told him to go up and see if it was trimmed. Plaintiff started to go up in the elevator, and when he had got up a few feet one Walsh, an employé of the defendant, hallooed across the street, and said, "Tom, that tower is trimmed;" and plaintiff then said to Fitzgerald, "Tom, there is no use going up, as long as it is trimmed; let her go." Fitzgerald replied, "You do as I tell you, and go on up." Plaintiff testifies that he must go up or be discharged, and therefore went on. He told Walsh to come and "give him a pull," and Walsh did so. He and Fitzgerald were both standing at the bottom of the tower on the first section, about twelve feet from the ground. Plaintiff went up two or three sections, and the elevator stopped.

"There was a little ice on the cables, and the guys that went through the cage in the elevator clogged the holes up with ice, so she stopped, and we let her down about six inches or so, and started up again, and kept going that way until we got up to the seventh section, about 60 or 65 feet, and the cable broke."

The defendant gave testimony in its behalf tending to show that there was so much ice on some of the cables that the foreman did not send plaintiff up some of the towers. There did not seem to be much ice on the tower

at the post-office corner, and plaintiff went up and trimmed the lamps without difficulty. The foreman testifies that when they came to the post-office tower he looked at the cable.—

"And there did not appear to be hardly any ice on it, and so we spoke about using it, and he [Weiden] said 'All right,' and got into the elevator, and I pulled on the running cable to help him."

He further swears, in relation to the tower where the accident happened:

"There did not seem to be any more ice on that, from general appearances, than the one at the post-office, and we concluded to run the elevator, and he got in the elevator, and started to ascend. * * * Mr. Walsh came across the road, and he says, 'That tower is trimmed.' 'Well,' I says, 'there will not be any use in going up;' and he said, 'Let her go, anyway.' Weiden spoke up, and said, 'Let her go, anyway;' and she was started. So I spoke to Mr. Walsh, and he came up and stood on the pedestal of the tower."

He denies that he ordered plaintiff to go up after Walsh said the tower had been trimmed. All that he did was to acquiesce in the suggestion of Weiden that he should go up anyway.

It appears that the last time this particular tower was inspected was before September 1, 1886. Three witnesses depose that they notified the superintendent of the defendant in 1886 that this cable was defective, one of them late in the fall. There was some dispute as to the condition of the wire of the cable at and about the place where it was broken, but there was sufficient evidence to warrant the jury in finding that it was so defective as to be unsafe, and that proper inspection would have disclosed its defective condition before the accident.

In his third request the counsel for the defendant asked the court to instruct the jury, in substance, that if the plaintiff's duties on the day of the injury were to

trim towers, and that only, and the tower had been trimmed, and there was no occasion for his going up to trim it, he could not recover, as he was not in the performance of any duty. It was properly refused. If it was the duty of plaintiff, as it seems to be conceded, to trim lamps under the direction of the foreman, and the foreman ordered him to go up the tower for that purpose, or to see whether or not the lamps had been trimmed, it can make no difference whether such lamps had been trimmed that day or not. The foreman, if they had been trimmed once, would have had the undoubted right to see that they had been trimmed properly, and to direct that they should be trimmed again if the work had not been well done in the first place; and it would have been, in either case, the duty of plaintiff within his employment to obey the foreman.

The defendant's fourth request was as follows:

"If you find that the ice on the cable made it dangerous for the plaintiff to go up, using the cable, that he knew that fact, and that he used the cable notwithstanding such knowledge, and that he could have gone up in another way that would not have subjected him to such danger, then he cannot recover."

We find no evidence to support this request. Neither the plaintiff nor the foreman supposed there was any danger on account of the ice. Yet the court substantially gave it, only qualifying it by stating that if, under the circumstances, he—

"Recklessly attempted to ascend by means of this elevator, in that way contributing to this accident, he cannot recover in this case."

There was no error committed in this action of the court. The matter of the ice making it dangerous to ascend this cable, and the plaintiff's knowledge of the danger from that source, was not in issue by the proofs,

73 MICH.—18.

and the court might well have said nothing about it. What he did charge could not have harmed the defendant, when it was not entitled to have any such issue put to the jury. The plaintiff might complain, but not the defendant.

The fifth request was as follows:

"If you find that the towers in question were constructed by another company, that the cable on this tower was manufactured by a competent and careful firm engaged in such business, and that the defendant employed suitable and competent men to examine the same, and that they did so on all proper times and occasions, and discovered no defects, the company would not be liable for the accident caused by a casual defect unknown."

In this case there was no question but that the towers, elevators, and cables were properly constructed. The claim of the plaintiff was that the cable had become broken and ragged on the outside; that enough of the wires had rusted off, and others weakened by rust, so that the cable was weak, rotten, and defective; that these facts had been made known to the superintendent by several persons; and that the company, after such notice, had not only failed to replace this cable by a new one, but had neglected to make any examination of the same to ascertain if these defects existed. The testimony of the superintendent shows that this cable had been in use since August, 1884, at least, and there was no evidence that this tower, elevator, and cable had ever been examined for defects. The superintendent swears that he had reports in writing of the examination of the towers, but he did not produce the reports, nor was any witness sworn that had examined them. He also admits that there was no special examination of this particular tower in 1886, and he does not remember of any reports being made to him of any defects in this cable, but he does

not depend on his memory; "we depend upon records, and on the examination of these records at noon I could not find any such reports." I think the request was properly refused. The court said as to this matter:

"It is also claimed on behalf of the defendant that they had a number of cables in use in the city of Detroit such as were used in this tower, and that these cables were purchased from a well-known manufacturer, and that only in two or three cases have they discovered any defects in these cables; that the cable in question was able to stand a strain of three and a half tons. All these things may be taken into consideration by you as bearing on the right of the plaintiff to recover; bearing upon the care and caution that the defendant has exercised in looking after these cables, and this cable in particular; also the testimony that they have given as to the examination made of this cable by men in the employ of the defendant, and what care they took to see that it was in proper condition so as to be used by the workmen in their employ."

As before said, there was no competent evidence in the case that any examination of this tower and its cable had ever been made. The defendant showed by its superintendent that it was customary every fall to send competent men around to see if the towers, elevators, and cables needed any repairs, and that there were reports in the office showing such work, but there was no special report in relation to this tower, and no reports were produced. The superintendent did not himself know of any examination of this tower, nor was any proof given of any such examination. Four different persons, who were or had been employés of the company, testified that they notified the superintendent in 1886 of defects in this cable, verbally. He does not undertake to deny it, except as he swears he cannot find any written reports to that effect, and he puts no reliance upon his memory outside of these records.

The case then stood squarely before the jury, and was

so put to them by the court, that if they believed the superintendent was notified, as these witnesses testified, the defendant was negligent, there being no proof of any attention being paid to the notice of the defects. If the plaintiff was ordered up this tower, as he and one other witness testified, he was entitled to recover. If he went up of his own accord, as the foreman and Walsh testified, he could not recover. We think on the question of the negligence of the company the court, in permitting the jury to consider this testimony of the examination of the towers, etc., by its employés, was more indulgent to the defendant than the case made by it warranted. The evidence failed to show, by any competent testimony, any proper care or caution on the part of the company.

And there was no evidence of any contributory negligence on the part of the plaintiff, unless the jury found that he went up of his own motion.

The judgment is affirmed with costs.

The other Justices concurred.