# PERRY EUGENE CORBY v. MISSOURI & KANSAS TELEPHONE COMPANY, Appellants.

In Banc, December 17, 1910.

1. **NEGLIGENCE: Master and Servant: Telephone Company: Custom.** A telephone company owes its linemen the same duty to furnish them a safe place in which to work that all other masters owe their servants in that regard. And where the work in hand was the dismantling and reconstruction of a large telephone plant, and it was being done under the supervision of a superintendent and foreman, whose duty it was to inspect the poles and determine and mark which ones of them were to be removed and replaced with new ones, and a lineman, in the performance of his duty to remove the wires and cross-arms from poles so designated, mounted a pole which had rotted in two just below the ground, it was the company's duty to inspect the pole, and the superintendent's and foreman's failure to do so was the company's negligence; and the company is not to be excused on the theory that it was customary for linemen, in the performance of their ordinary and usual duties to repair broken wires and poles along telephone lines, to inspect poles themselves before mounting them.

2. ————: ————: ————: ————: **Overcome by Evidence.** And even if it could be held to be the law that a general understanding and custom that linemen were to inspect the poles before mounting them relieved the company of liability for failure to make an inspection, yet proof that there was no such custom or understanding will overcome such a defense.

3. ————: ————: **Assumption of Risks: Glaring Defects.** Knowledge of the defective condition of a telephone pole, which fell when the lineman mounted it to remove the cross-arms and wires, does not destroy his right to recover, unless the defect was so glaring as to threaten immediate danger.

4. ————: **Damages: Wages: Broader than Petition.** The petition detailed plaintiff's injuries, and then alleged that "as the result of said injuries plaintiff has suffered and will always continue to suffer great bodily pain and mental anguish, to his damage in the sum of $35,000"; and "has incurred and will incur great expenses for medicines, nursing, and medical attention in the sum of $1000;" and that "prior to said injuries" he had earned $3 per day, and "but for said injuries would

231 Sup.—27

have continued to earn that amount," but "as a result of said injuries his ability to earn a livelihood has been lost or greatly impaired, and he has lost and will continue to lose his time from his work and his earnings. as a result thereof." It then charges the facts constituting defendant's negligence, and closes with a prayer for "judgment against said defendant in the sum of $36,000". *Held*, that the petition is broad enough to authorize the jury to allow plaintiff damages for the loss of time and wages, past and future, and cannot be restricted to a demand for damages for personal injuries and medical treatment alone. The final prayer is broad enough to include all loss of time and wages, and the apparent contradiction between it and the former allegations is more apparent than substantial and is in fact without substance.

5. **EVIDENCE: Offered and Excluded: Prejudicial.** An offer by respondent to prove certain facts by appellant's witness, apparently for the purpose of impeachment, but ruled out by the trial court, will not be held to have been misleading or prejudicial, if no such objection was made at the trial, and it cannot be seen how appellant was injured by the offer.

6. **EXCESSIVE VERDICT: $22,500.** Plaintiff, twenty-seven years old, vigorous, healthy and active, earning $3 per day, had, as a lineman working under a superintendent, gone up one of defendant's telephone poles marked for removal, to remove the cross-arms and wires. The pole was rotten at the bottom, and when the wires were removed, it fell, and spinal concussion followed. The spine was broken, he received various internal and external injuries, he is completely paralyzed from the hips down, he suffered intolerable pain and mental anguish, and his capacity to earn a livelihood is practically destroyed. *Held*, that a verdict of $22,500 is not excessive.

Appeal from Clay Circuit Court.—*Hon. Francis H. Trimble,* Judge.

AFFIRMED.

*Battle McCardle* and *Gleed, Hunt; Palmer & Gleed* for appellant.

(1) Plaintiff was engaged in tearing down old work for the reason that it was worn out and had to be replaced. Conditions with regard to safety changed continually as the work progressed. The unsafe condition, if there was an unsafe condition. arose on ac-

count of work done by plaintiff. For these reasons the rule that the master must furnish a safe place to work does not apply, and the risk was one which was assumed by plaintiff. Tweed v. Telephone Co., 114 N. Y. Supp. 607; Thompson on Negligence, sec. 3876; Montgomery v. Robinson, 229 Ill. 466; Slagel v. Village, 139 Ill. App. 423; Gibson v. Bridge Co., 112 Mo. App. 599; Shearman and Redfield on Negligence, sec. 185; Ballard v. Lee's Adm'r, 115 S. W. (Ky.) 735. The pole on which plaintiff was working was nothing but an ordinary log of wood, and the only defect possible was ordinary decay. Where a servant uses simple appliances or structures of this kind, he assumes the risk of defects arising from ordinary wear, tear and decay, as he is in as good position to ascertain and comprehend the defect as the master. Forbes v. Dunevant, 198 Mo. 209; Beckman v. Brewing Association, 98 Mo. App. 555; Miller v. Railroad, 47 N. Y. Supp. 285; Marsh v. Chickering, 101 N. Y. 396; Cahill v. Hilton, 106 N. Y. 512; Cregan v. Marston, 126 N. Y. 568; Patnode v. Harter, 20 Nev. 303. Wooden poles placed in the ground decay at uncertain intervals. Linemen assist in erecting poles and in keeping them in repair, and in replacing them when they are decayed. Linemen are taught as a part of their duty how to test poles, and are the only ones who climb the poles. It would therefore be an absurdity to send an inspector out ahead of the linemen to inspect poles for the linemen. On account of all the reasons given above, it is universally held that it is the duty of a lineman to inspect poles for defects before climbing them. Miller v. Telephone Co., 141 Mo. App. 462; Roberts v. Telephone Co., 166 Mo. 370; Junior v. Power Co., 127 Mo. 79; Epperson v. Postal Co., 155 Mo. 373; Sias v. Light Co., 50 Atl. 554; McGorty v. Telephone Co., 38 Atl. 359; Tanner v. Railroad, 62 N. E. (N. Y.) 993; Krimmel v. Illuminating Co., 90 N. W. 336; Saxton v. Telephone Co., 84 N. W. (Minn.) 109; Broderick v. Railroad, 77

N. W. (Minn.) 28; Dixon v. Telephone Co., 68 Fed. 630; Greene v. Telephone Co., 72 Fed. 250; Kellogg v. Tramway Co., 72 Pac. (Colo.) 609; McIsaac v. Light Co., 51 N. E. (Mass.) 524; Evansville Co. v. Railey, 76 N. E. (Ind.) 548; Cahill v. Hilton, 13 N. E. (N. Y.) 341; Southwestern Co. v. Tucker, 114 S. W. (Tex.) 790. The only exception to the foregoing rule which has ever been recognized is where the master assumes the duty of inspection and refuses the lineman an opportunity to inspect. In this case it is shown without contradiction that linemen are required to inspect for themselves in Missouri; Pennsylvania; Davenport, Iowa; Detroit, Michigan; Cleveland, Ohio; Illinois; Ohio; Indiana; Des Moines, Iowa; Arkansas; Cincinnati, Ohio; and Kansas City, Missouri. As against this there is only plaintiff's testimony that he had not tested poles on the Pacific coast and that he did not test at Fort Scott, where the injury occurred. The custom, or practice, on the part of plaintiff, or other employees, of doing work in an unsafe manner would not excuse plaintiff. Crocker v. Schureman, 7 Mo. App. 358; Carrier v. Railroad, 61 Kan. 447; Loranger v. Railroad, 104 Mich. 80; Railroad v. Robins, 43 Kan. 145; George v. Railroad, 109 Ala. 245; Larson v. Ring, 43 Minn. 88; Railroad v. Clark, 108 Ill. 113; Railroad v. Evansich, 61 Tex. 3. Plaintiff testified that it was not his duty to inspect poles. This was a mere conclusion of law. 12 Ency. Pl. and Pr., 1040. Duty must arise either from employment or by operation of law. Plaintiff testified that he had never been told not to inspect and had never been told that anyone else would inspect for him. The duty he testified to, therefore, did not arise out of contract of employment, and the authorities above cited show conclusively that it did not arise by operation of law. Plaintiff's testimony that it was not his duty to inspect was, therefore, a mere erroneous conclusion of law on his part, and insufficient

to take this case out of the general rule shown by the authorities cited above. (2) Plaintiff's sixth instruction directed the jury to allow plaintiff for loss of time and earnings, past and future. The petition did not ask for such allowance. The instruction was therefore erroneous. Coontz v. Railroad, 115 Mo. 674; Mallor v. Railroad, 105 Mo. 462; Keen v. Railroad, 129 Mo. App. 305; Dutsch v. Ables, 15 Mo. App. 398; Smith v. Railroad, 108 Mo. 243; Pryor v. Railroad, 85 Mo. App. 367; Stoetzle v. Swerenger, 96 Mo. App. 592; Waldopfel v. Transit Co., 102 Mo. App. 524. (3) The damages ($22,500) are excessive. Reynolds v. Railroad, 189 Mo. 408; Brady v. Railroad, 206 Mo. 509; Stoltze v. Railroad, 188 Mo. 581; Davidson v. Railroad, 211 Mo. 320; Gibney v. Railroad, 204 Mo. 704; Chitty v. Railroad, 166 Mo. 435; Furnish v. Railroad, 102 Mo. 438; Gurley v. Railroad, 104 Mo. 211.

*Boyle, Guthrie, Howell & Smith* for respondent; *Jos. S. Brooks* of counsel.

(1) No invariable rule can be laid down whereby it can be declared as a matter of law that a master is relieved from the duty of inspection. The duty of the master must necessarily depend upon the circumstances of the case. And the rule applies to telephone companies. The following cases hold it the duty of the company to inspect. Telephone Co. v. Holtby, 29 Ky. L. R. 523; McGuire v. Telephone Co., 167 N. Y. 208; Edison Co. v. Dixon, 17 Tex. Civ. App. 320; Dawson v. Gaslight Co., 188 Mass. 481; Telephone Co. v. Woughter, 56 Ark. 192; Williams v. Lumber Co., 132 Ga. 221; W. U. Tel. Co. v. Tracy, 52 C. C. A. 168 (114 Fed. 282); Telephone Co. v. Bills, 62 C. C. A. 620 (128 Fed. 272); Weiden v. Light Co., 73 Mich. 268; Electric Co. v. Kelly, 61 N. J. L. 289; Walsh v. N. Y. Co., 178 N. Y. 588; McDonald v. Telephone Co., 22 R. I. 131; Bell Co. v. Clements, 98 Va. 1; Dupree v. Alexander, 29 Tex. Civ. App. 31; Clairain v. W. U. Tel. Co., 40 La.

Ann. 178; Munroe v. Hey, 156 Fed. 468. (2) The court did not err in giving plaintiff's sixth instruction. It was in accord with the petition and evidence, and follows approved precedents. The measure of damages was correctly defined.. Devoy v. Railroad, 192 Mo. 197; Gurley v. Railroad, 122 Mo. 141; Smith v. Railroad, 119 Mo. 246. (3) The damages were not excessive. The injuries sustained were grave and permanent and plaintiff is permanently disabled and crippled by them. He is permanently disabled from walking. Minter v. Bradstreet, 174 Mo. 504; Dowd v. Air Brake Co., 132 Mo. 579; Woodson v. Scott, 20 Mo. 372; Longan v. Weltmer, 180 Mo. 322; Copeland v. Railroad, 175 Mo. 650.

WOODSON, J.—This suit was begun by the plaintiff against the defendant in the circuit court of Jackson county, to recover $36,000 as damages for personal injuries sustained by him through the alleged negligence of the company, while he was assisting in tearing down an old and rebuilding a new telephone plant in the city of Fort Scott, Kansas, on the 5th day of December, 1905.

It is necessary, in order to understand some of the legal questions presented by this record, to set out the petition upon which the cause was tried. It reads as follows (formal parts omitted) :

"Plaintiff says that the defendant is now, and was at all the times hereinafter complained of, a corporation duly organized and existing according to law, and engaged in the business of operating and maintaining a system of lines of telephone in the States of Missouri, Kansas and elsewhere. As a part of its said system and lines it does now, and did at all the times herein complained of, operate telephone lines in the city of Fort Scott, in the State of Kansas. As a part of said system at Fort Scott, its telephone wires are, and were at all the times herein complained of, strung on wooden

poles. On or about December 5, 1905, plaintiff was in the employ of the defendant in the capacity of a lineman, and in the performance of his duties as such lineman he was directed by defendant, and it was necessary as a part of his duties as such employee of defendant, to climb upon a wooden pole then being used, maintained and controlled by and for the defendant, for the purpose of performing certain work for the defendant thereon. While he was on said pole, and at a height thereon of about twenty feet from the ground, said pole broke and fell because of its rotten, weak and defective condition, thereby causing plaintiff to fall to the ground and pavement below, and inflicting upon him great and lasting injuries. As the result of said fall his sacrum and coccyx were broken, fractured, bruised and injured, and plaintiff was injured and bruised in all parts of his body, head and limbs, and he received a severe shock and concussion to his spine, spinal cord and brain, his abdominal walls were ruptured, bruised and broken, and the organs of his body were wounded, shocked and injured. As the result of said injuries plaintiff has suffered from dizziness, numbness and vertigo, and he has permanently lost the control and use of his legs and the same have been paralyzed, and his organs refuse and will always refuse to perform their functions. His eyes were and will continue to be affected by said injuries, and his eyesight has been and will continue to be greatly impaired thereby. As the result of said injuries plaintiff has suffered and will always continue to suffer great bodily pain and mental anguish, to his damage in the sum of $35,000. As the result of said injuries plaintiff has incurred and will incur great expenses for medicines, nursing and medical attention in the sum of $1000.

"Prior to said injuries plaintiff was about twenty-seven years of age and possessed of full strength and vigor, and prior to that time he was earning about

three dollars per day, and but for such injuries would have continued to earn that amount or more than that amount. As the result of said injuries his ability to earn a livelihood has been lost or greatly impaired, and he has lost and will continue to lose his time from his work and his earnings as a result thereof.

"Plaintiff says that his injuries resulted directly from the negligence of the defendant in this, to-wit: That the defendant negligently ordered the plaintiff to go upon said pole when defendant knew or by the exercise of due care should have known that said pole was rotten, weak and defective, as it was, in time by the exercise of due care to have repaired or replaced said pole before directing or permitting plaintiff to use the same in the performance of his duties, and defendant negligently failed to properly inspect said pole to ascertain its defective condition, and negligently failed to warn plaintiff that the same was, as it was, rotten, weak and defective.

"Wherefore, plaintiff prays judgment against said defendant in the sum of thirty-six thousand dollars, and costs of suit."

The answer consisted, first, of a general denial; second, a plea of contributory negligence; and, third, a plea of assumption of risk upon the part of the plaintiff.

The reply was a general denial of the new matter stated in the answer.

Upon the application of the defendant, the venue of the case was changed to the circuit court of Clay county, where a trial was had which resulted in a judgment for the plaintiff for the sum of $22,500. From this judgment the defendant appealed to this court.

At the time complained of the defendant was a corporation engaged in the construction, management and operation of a system of telephone lines through the States of Missouri, Kansas and elsewhere. On December 5, 1905, defendant, among other things, was

engaged in tearing down an old telephone plant it had purchased, in the city of Fort Scott, Kansas, and was constructing, in lieu thereof, a new plant. All of this work was being done under the supervision and control of one M. D. Craiglow. There were several sub-foremen under him who had charge and supervision of the various branches of the work, among whom was one Louis Butler, who had charge of the work of tearing down the old lines. This work consisted of climbing the old poles, cutting the old wires from the poles and cross-arms, taking from the poles the old cross-arms, and tearing down all old and defective and rotten poles. The plaintiff and some three or four other men constituted Butler's gang, called linemen, and were engaged in dismantling this old plant at the time the injury complained of occurred.

The plaintiff's evidence tended to show that there was a large number of defective poles, and that Butler went in advance of the linemen, inspected the poles and marked out the work the linemen were to do, and told them what poles to climb and what work was to be done on each; that Butler inspected the poles by different means, frequently in the presence of the linemen, and when one was found to be defective and dangerous, he would point it out and notify the lineman of that fact, but did not notify or point out to plaintiff the decayed and dangerous condition of the pole on which he was injured. That plaintiff had no knowledge whether the pole had been inspected or not before he was injured, but supposed from Butler's previous conduct in that regard that it had been. That Butler was present when plaintiff climbed this pole and handed him a hand-ax, with which to do some work which was required to be done at the top of the pole; that plaintiff and the other linemen relied upon Butler's inspection of the poles and made no examination for themselves beyond a mere casual observation of their exterior appearance; that the pole on which plaintiff was injured

was a trolley pole belonging to the street railway company, on which defendant had strung some of its wires; that the plaintiff and the gang with which he was working were instructed to cut and remove the defendant's wires from said trolley pole, and in pursuance to those orders the plaintiff ascended the pole and cut all the wires except those leading east from it; that when said wires were cut the pole fell with the plaintiff, and he was thereby seriously injured. After the pole fell, an investigation showed that it was decayed and rotten at the base, unable to stand alone, and was maintained in its upright position by means of the wires attached thereto, and that when they were cut the pole fell with the plaintiff. The decayed portion of the pole was obscured from casual observation by the earth but that condition could have been easily and readily discovered by several means, namely, by placing a "pick pole" up against the top of the trolley pole and brushing it back and forth; by digging the earth from the base of the pole, which would have exposed the decayed condition; by chopping into the base of the pole with an ax or other sharp instrument. All of these means of inspection were present and could have been used. The plaintiff had no knowledge of the decayed and dangerous condition of the trolley pole when he climbed it, nor was he notified of its dangerous condition by Butler, or by anyone else. These facts were testified to by several witnesses.

The evidence showed that at the time of the injury the plaintiff was a strong, vigorous young man of twenty-seven years of age, was an experienced lineman and was receiving three dollars for his labor. He received divers internal and external injuries of a very serious character; he suffered intense mental anguish and physical pain and it is not denied but what his injuries are permanent, and he is hopelessly paralyzed from his hips down, and will never be able to care for himself or even earn a livelihood.

The evidence introduced on the part of the defendant tended to show that plaintiff had worked as a linesman for four years prior to entering defendant's employment, and during the last two years thereof had received the wages usually paid to a first-class lineman; that for six months of that time he had been a foreman of a lineman gang, and represented himself to defendant as being a first-class lineman. That Butler and all other foremen and their gangs of men "in town and the whole work was done under a foreman named Craiglow." That before the plaintiff climbed the trolley pole he made no inspection or otherwise tested it to ascertain whether or not it was in a sound and safe condition. That it requires no special knowledge to make such tests. The modes are simple. Where the decay is a few inches below the ground, it may be discovered by grasping the pole with the hands and shaking, kicking it at the base, putting pick poles against it and pushing it with them, climbing up the pole a few feet and then shaking it, and by digging about the base of the pole with a shovel or hand-ax.

Plaintiff testified as follows upon this subject: "Q. Does it require any special skill or knowledge to make these tests to ascertain whether or not the pole is sound? A. Well, I cannot say that it does. Q. You as a lineman could make those tests to determine whether a pole was sound or not, just as well as a foreman? A. I could if I was instructed to do so. Q. You were not as competent to determine that question as the foreman would be? A. Provided I was instructed. Q. When did you first learn, Jack, how to make those tests? A. That is about the first thing a lineman learns. They drill you on that. Q. Well, you knew the different methods of testing poles? A. I have answered that—yes, sir. Q. Did you use any of those methods in ascertaining whether that was a safe pole or not. A. I was not ordered to do so. Q. Answer that question, yes or no. A. No, I did not.

Q. Was there anything that Mr. Butler could have done that you could not have done? A. No, sir. Q. You could have ascertained it just as well as Mr. Butler? A. Yes, sir.''

The testimony of defendant also tended to show that it was not the custom of defendant company, or of telephone companies generally, to have the poles inspected for the linemen, but on the contrary, it was the custom for the linemen to test poles for themselves.

The evidence of plaintiff in rebuttal tended to contradict the evidence introduced by the defendant bearing upon all of the material issues joined.

The court at the request of the plaintiff, over the objections of the defendant, instructed the jury as follows:

"1. The jury are instructed that even though you may believe from the evidence that the plaintiff knew, or by the exercise of ordinary care could have known, that the position he was working in at the time he claims to have been injured was not a safe one, yet this does not and should not defeat his recovery in this case if you further find and believe from the evidence that he was negligently permitted to go into this position by the defendant's representatives in charge of plaintiff, and that the danger, if any, was not of such a glaring and dangerous nature as to threaten immediate injury in case he did such work.

"2. If you find from the evidence that at the time plaintiff claims to be injured he was in the employ of the defendant, and that while he was in the performance of his duties as such employee, he fell with or from the pole referred to in the testimony because of the unsafe and defective condition of such pole (if it was unsafe and defective), and was injured thereby; and that plaintiff went upon such pole in the course of his employment (if any) by the defendant pursuant to an order or direction of a foreman of the defendant; and that such foreman in giving plaintiff such order or

direction (if any) had authority from the defendant to direct and order the plaintiff to go upon said pole as a part of his duties as such employee; and that at the time of such order or direction (if any) the condition of such pole was known, or by the exercise of ordinary care could have been known to the defandant, then your verdict must be for the plaintiff, provided you further believe that the plaintiff was in the exercise of ordinary care at that time.

"3. By the term ordinary care as used in these instructions is meant such care as would have been used by an ordinarily prudent person under the same and similar circumstances. Negligence is the failure to use ordinary care.

"4. The court instructs the jury that they must disregard and pay no attention whatever to any alleged conversation in Mr. McCardle's office on Sunday prior to the commencement of this suit, between Tippen and Creighton, as there was no evidence introduced on the part of the plaintiff either to prove said conversation or in rebuttal of any testimony in this case.

"5. The court instructs the jury that if you find under the law and the evidence for the plaintiff, then and in that event you cannot allow plaintiff anything for expenses, nurse hire, medicine, or medical attention, as there has been no evidence given covering those items as set forth in the petition.

"6. The court instructs the jury that if, under the evidence and instructions of the court, you find in favor of plaintiff, you should assess his damages at such amount as you believe, from the evidence, will be a fair compensation for the pain of body and mind (if any) which he has suffered, occasioned by his injuries in question, if any, for such pain of body and mind, if any, as you find plaintiff will, with reasonable certainty, suffer in the future, occasioned by such injuries, and for such permanent injury, if any, to plaintiff, as you may find was occasioned by such injuries,

and for such loss of earnings, if any, as you may believe from the evidence he has suffered in consequence of said injuries, or will, in all reasonable certainty, suffer on account of said injuries, if any, but the total damages which you may allow plaintiff must not, in any case, exceed the sum of thirty-five thousand dollars.''

The defendant prayed the court and it gave to the jury the following instructions, numbered, 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15, and 16, to-wit:

"1. The court instructs the jury that if you find from the evidence in this case that the injuries complained of were the result of an accident for which neither the defendant, its agents or servants, nor the plaintiff were to blame, then the plaintiff cannot recover, and your verdict will be for the defendant. An injury is said to be an accident when it is not attributable to nor caused by the negligence of anyone. Negligence is the failure to use ordinary care.

"2. The court instructs the jury that if you find from all the evidence in this case that the plaintiff was guilty of any negligence, however slight, which was the proximate cause of his injury, he cannot recover, even though you should find the defendant was guilty of negligence which contributed to the injury complained of.

"3. The court instructs the jury that the law of negligence governing this case is the same law as between man and man; and in considering this case the jury are to decide without reference to the fact whether or not one of the parties is the corporation.

"4. The jury are instructed that the fact that the plaintiff has brought this suit against the defendant constitutes no grounds upon which he is entitled to a verdict; and the fact, if you should find it to be a fact, that the plaintiff met with an accident does not in and of itself constitute grounds on which he is entitled to a verdict; and the fact that the plaintiff is a poor man

constitutes no reason why he should recover. What-
ever your sympathies are for plaintiff cannot enter
into this case. In this case the gist of the action is the
negligence alleged in plaintiff's petition, and if you are
satisfied from the evidence before you that there was
no such negligence on the part of the defendant, or
that such negligence was not the direct or proximate
cause of the injuries complained of, then plaintiff can-
not recover and your verdict must be for the defendant.

"5. The court instructs the jury that the defend-
ant had the right to conduct its business in its own
way, and had the right to require its servants, includ-
ing the plaintiff in this case, to perform dangerous
work; and you are instructed that the defendant can-
not be held liable for any injury resulting solely from
the dangerous character of the business or work that
plaintiff was performing at the time of the injuries
complained of.

"6. The jury are instructed that the defendant
had the right to employ the plaintiff, and to require
him to perform the work of taking down old wires and
poles, and defendant cannot be held liable for any in-
juries received by the plaintiff which resulted from
any danger surrounding the work which plaintiff was
required to do, which danger plaintiff could have as-
certained by the exercise of ordinary care and caution.

"7. The court instructs you that if you find from
all the evidence in this case that in the manner and
custom of conducting its business the defendant did not
have or furnish any inspector for the purpose of in-
specting its line, lines, or poles, to determine whether
they were safe to work upon, and that in the conduct
of its business defendant's employees, including plain-
tiff, were required to do their own inspection for the
purpose of determining whether the poles which they
were required to climb were safe or not, then you are
instructed that it was the plaintiff's duty to examine
the poles before going upon them, and the defendant

owed to plaintiff no duty to inspect the poles; and in that event, the jury are not authorized to find a verdict against defendant on account of failure to inspect the poles on which plaintiff was required to work.

"8. The court instructs the jury that the defendant in this case was not an insurer of the safety of the plaintiff while he was performing his work, and the jury are instructed that they cannot find a verdict for the plaintiff from the mere fact that the plaintiff received an injury while in the employ of the defendant, but the burden rests upon the plaintiff to prove to your satisfaction that the injuries complained of resulted from the direct negligence of the defendant.

"9. The court instructs the jury that it was not the duty of the defendant to look after the safety of the plaintiff in the performance of his work, but it was the duty of plaintiff while performing his work to exercise care and caution to protect himself from injury, and the care and caution he was required to exercise was such care and caution as was commensurate with the danger he knew he was exposed to in the performance of his duties; and if the injuries complained of resulted from his failure to exercise such care and caution, then your verdict must be for the defendant in this case.

"10. The court instructs the jury that if you find from all the evidence in this case that plaintiff was employed to take down old wires and poles and was instructed in doing said work to examine said poles before he went upon the same, and plaintiff was injured by reason of going upon said pole which was rotten under the ground, which fact might have been ascertained by him in making a proper inspection of the same, and that he failed to make the inspection required of him, then and in that event plaintiff cannot recover, and your verdict must be for the defendant.

"11. You are instructed that if you find from all the evidence that under the manner and custom of the

defendant in conducting its business it did not have or furnish any inspector for the purpose of inspecting the poles on which plaintiff was required to work, to determine whether they were safe or not, and that in the conduct of its business its employees, including the plaintiff, were required to do their own inspecting of said poles and performing the said work, and that plaintiff knew, or should as a telephone lineman have known, of this custom and manner of work, then defendant owed to plaintiff no duty of inspection; and in that event the jury are not authorized to find any verdict against the defendant on account of its failure to inspect said poles before requiring said defendant to go upon the same.

"12. You are instructed that the fact, if you should find it to be a fact, that the plaintiff was, at the time of the accident complained of, engaged in hazardous employment, and that he had been performing said work only a short time prior to the accident complained of, is not to be taken into consideration by you in determining this case, for you are instructed that at the time that the plaintiff sought the employ of the defendant the defendant had the right to assume that he was a careful and competent man and understood the nature of the employment which he sought of the defendant, and that if he was injured by reason of his ignorance of the work which he was performing, or any inefficiency on his part, the plaintiff cannot recover, and your verdict must be for the defendant.

"13. You are instructed that the plaintiff, while in the employ of the defendant, by the terms of his contract of employment, thereby assumed all the usual and ordinary risks and hazards of the business and work that he was employed to perform and also all the extra hazards and risks which were known to him, or by the exercise of reasonable care and prudence on his part could or might have been known to him, and the plain-

tiff in this case cannot recover against the defendant for any injuries growing out of such assumed risks.

"14. The court instructs the jury that if you find from all the evidence in this case that the plaintiff was employed at the time of the injuries complained of in tearing down an old telephone line, and that he understood the nature of his employment and that he had been instructed to examine the poles he was required to climb in doing said work before going upon said poles in order to ascertain whether they were safe or not, and that plaintiff was injured by reason of one of the poles falling with him, the condition of which was known, or could have been known, to the plaintiff by making a proper inspection of the same before going upon it, then plaintiff cannot recover in this case, and your verdict will be for the defendant.

"15. The court instructs the jury that the burden is on the plaintiff to make out his case by a preponderance of the testimony, and unless he has done so your verdict will be for the defendant. By a preponderance of the testimony is meant the greater weight of the credible testimony in this case.

"16. The court instructs the jury that the plaintiff cannot recover in this case unless he was free from negligence which contributed to the injuries complained of, and defendant was guilty of negligence which was the direct proximate cause of said injuries."

The defendant also prayed the court to give the jury the following other instructions, numbered A, B, C, D and E, to-wit:

"A. The court instructs you that inasmuch as the plaintiff has failed to prove, under the law and the evidence, that he is entitled to recover of and from the defendant in this case, you are instructed, as a matter of law, to find a verdict for the defendant and against the plaintiff.

"B. You are instructed that if you find from all the evidence in this case that the plaintiff knew, or by the exercise of reasonable inspection could have ascertained, that the pole which fell with him was not safe to work upon, and that plaintiff went upon the same without making the necessary inspection required of him to ascertain whether the pole was safe to go upon and cut the wires in the manner he was doing, he was guilty of such negligence as will bar a recovery in this case, and you will find a verdict for the defendant.

"C. You are instructed that if you believe from the evidence in this case that the accident complained of could have been avoided by the plaintiff by the exercise of care and caution by examining the said pole before he went upon the same, and that he failed to make the necessary examination, he was guilty of such negligence as will bar a recovery in this action, and your verdict will be for the defendant.

"D. You are instructed that it was the duty of the plaintiff to use ordinary care and caution in and about his work, and that one of his duties was to examine the poles he was required to climb before going upon the same, and if you find from the evidence in this case that the said plaintiff did not make the proper examination of the pole which he claims fell with him by reason of its weakened condition, plaintiff cannot recover in this case, and your verdict will be for the defendant.

"E. You are instructed that if you find from all the evidence in this case that it is the custom for linesmen to inspect the poles on which they are required to work, for the purpose of determining whether or not they are safe, and that it is a part of the usual duty of such linesmen to so inspect, and that plaintiff represented himself to be a competent linesman, then you are instructed that plaintiff is charged with knowledge of such custom, and that it became his duty to so inspect the poles on which he was required to work."

Which instructions the court refused; and to this action of the court in refusing said instructions, the defendant then and there excepted.

I. This cause was tried by both parties, it would seem from reading the evidence introduced and instructions asked by them, upon the theory, that the master was under no legal obligation to inspect and furnish the servant in this class of cases with a reasonably safe place in which to labor, but upon the theory as to whether or not there existed a custom and a general understanding between telephone companies and their employees as to whose duty it was to inspect the plant and look out for the safety of its employees, namely, that of the company or of the employees themselves.

Upon that point the court instructed the jury, in effect, that if they found from the evidence that such custom existed, then the defendant was not liable in any event; and upon the other hand, that if they believed that said custom did not exist, then the law of master and servant regarding such matters did apply; and then proceeded to instruct the jury at plaintiff's request, according to that law.

It goes without argument that the plaintiff in this case thereby assumed an unnecessary burden in that regard. The law of master and servant applies as well to telephone companies and their servants as it does to all masters and their servants. There is no exception to this rule, that we know of, which requires the master to furnish the servant with a reasonably safe place in which to labor, nor have learned counsel for either party cited us to any authority recognizing any such exceptions. Counsel for defendant do, however, cite us to adjudications which announce the well known and well familiar rule which is applicable alike to master and servants, namely, that where the duties of the servant are more or less dangerous, but depending solely upon the care and manner with which they were per-

formed, and not upon any danger connected with or incident to the place in which they were performed, and where the servant's knowledge of the dangers is better than that of his master's, the master is not liable in damages for injuries sustained by the servant in consequence thereof.

After a careful consideration of the authorities on that subject the doctrine just stated was announced by this court in an able opinion by Judge MARSHALL in the case of Livengood v. Lead & Zinc Co., 179 Mo. 229. That case was reviewed and followed by this court in the case of Bradley v. Tea & Coffee Co., 213 Mo. 320.

Nor would the master be liable for damages for injuries sustained by the *so-called* servant in consequence of the unsafe place furnished him in which to labor, where the servant is employed not only to repair the defects and make the place safe, but also to manage and control those repairs while they are being made, for the obvious reason that in such case the servant is employed because of his superior knowledge and experience in such matters, and, consequently, acts both for himself and the master, who presumably has no knowledge whatever upon the subject; but clearly that rule has no application to a servant who has no supervision or control over the work being done, especially where, as here, the work consisted of the dismantling and the reconstruction of one entire telephone plant in a large city under the supervision of a general manager and numerous assistant managers. In all such cases the general manager and his various assistants represent the master. In such case, clearly, the servants and linemen who are serving under and obeying their superiors are not representing the master. Under the condition of things as disclosed by this record, the law nowhere clothed the plaintiff or any of his fellow linemen with authority to supervise and control the work in which they were engaged. They had no authority to designate what poles, cross-arms or wires

were to be removed. That duty rested with Craiglow and his several sub-foremen; and it should be borne in mind that not all of the poles and cross-arms constituting the old plant were to be taken down, but according to all the evidence, only such poles were to be removed as were decayed or rotten. Who were to determine which poles were sound and which were unsound? Craiglow and his sub-foremen, or the linemen working under them? All the evidence shows that those selections had to be and were actually made by Craiglow and his assistants. And the question naturally suggests itelf, how could they decide what poles were sound and what ones were unsound except by an inspection? And after Craiglow and his assistants had determined what poles and cross-arms were to come down, and what work was to be done on them, how could plaintiff and his fellow linemen know what poles and cross-arms the former had determined to take down, and what work they, the latter, were to do on them, if Craiglow and his sub-foremen did not in some manner point out and indicate to them those matters? Plaintiff's evidence shows that Craiglow and his assistants not only had the authority to decide what poles were sound and which were unsound, but also they had to determine those matters by inspection, and point out to the linemen those which were rotten, and thereby indicate to them which poles they were to take down and remove, and that they had no authority to move any other poles. If plaintiff's evidence in that regard is untrue, then according to some of the defendant's evidence, the linemen not only took down the poles and did the other necessary work about them, but it was also their duty to inspect and ascertain for themselves what poles were sound and what ones were unsound; and, consequently, if defendant's evidence is true, it was the duty of the linemen to also have determined what poles were to be left standing and what ones were to be taken down.

This evidence if true would prove too much, and would show that Craiglow and his sub-foremen were not in fact foremen and sub-foremen over the linemen, but, upon the contrary, the linemen had the complete management and control of the work, as well as its execution. Such evidence is not worthy of credence, and the jury showed its good sense and sound judgment by disregarding it.

The evidence shows that the defendant was dismantling and reconstructing a large telephone plant at a great cost in a city of several thousand inhabitants. This required intelligence and scientific knowledge regarding mechanics, electricity and public safety. Such undertakings as a rule are placed under the management and control of master mechanics and electrical engineers, and not intrusted to the management and control of ordinary linemen, earning only three dollars a day. The truth of the matter is, as appears from this entire record, this entire work was being done by Craiglow and his sub-foremen, who represented the principal, and the plaintiff and his fellow linemen were just ordinary laborers working for the defendant under the orders and directions of Craiglow and his assistants. These foremen directed the linemen in what to do and when and where to do it; and the telephone company owed them the same duty to inspect and furnish them with a reasonably safe place in which to work that all other masters owe to their servants in that regard. There is not a whit's difference in principle between a telephone company and any other master in that regard; and none of the authorities cited by counsel for defendant announce a contrary doctrine, except an occasional unguarded general statement made by some judge in the argument of a case. But upon the other hand, all of those cases recognize the general rule, that telephone companies, by virtue of the relation of master and servant that exists between them and their employees, owe the same duty to their em-

ployees that all other masters owe to their servants under like circumstances and conditions. The following cases are to the same effect: Tel. Co. v. Holtby, 29 Ky. L. Rep. 523; McGuire v. Tel. Co., 167 N. Y. 208; San Antonio Edison Co. v. Dixon, 17 Tex. Civ. App. 320; Dawson v. Gaslight Co., 188 Mass. 481; Tel. Co. v. Woughter, 56 Ark. 206; Williams v. Garbutt Lumber Co., 132 Ga. 221; W. U. Tel. Co. v. Tracy, 52 C. C. A. 168 (114 Fed. 282); Tel. Co. v. Bills, 62 C. C. A. 620 (128 Fed. 272); Weiden v. Brush Electric Light Co., 73 Mich. 268; Electric Co. v. Kelly, 61 N. J. L. 289; Walsh v. Railroad, 80 App. Div. 316 (178 N. Y. 588); McDonald v. Telegraph Co., 22 R. I. 131; So. Bell T. and T. Co. v. Clements, 98 Va. 1; Dupree v. Alexander, 29 Tex. Civ. App. 31; Clairain v. W. U. Tel. Co., 40 La. Ann. 178; Munroe v. Ley, 156 Fed. 468.

Of course, as before suggested, where two or three linemen are sent out on an equal footing along a telephone line to inspect and make such repairs of defects in the poles and wires as they may discover, or which may have been pointed out to them, the master would not be liable to any one of them for injuries sustained in consequence of said defects for the obvious reason that they would be representing both the company and themselves in such matters, and would be executing the work according to their own plans, knowledge and judgment, and not under the supervision, orders and directions of a foreman representing the master. In such a case, strictly speaking, the relation of master and servant does not exist—the so-called servant, while he is an employee, being his own boss and not under the charge of nor subject to the orders or control of the employer, nor has he the right to assume that the employer will inspect the premises or that the place to be furnished him in which to work will be reasonably safe, for the reason that he was employed for the express purpose of making the inspection and repairing all defects discovered by him, or pointed out by others.

But even in the latter case, if one of the number mentioned should in fact be appointed to represent the master as his vice-principal or foreman, and should be placed in full charge and control of his associates who had no voice or discretion as to what they were to do, or when or where they were to perform their duties, but were subject to the control and orders of the foreman, then, under the elementary principles governing master and servant, the foreman would be liable to the latter for injuries sustained in consequence of being furnished an unsafe place in which to work, or for the negligent failure of the master to properly inspect the instrumentalities furnished the servant with which to labor.

In the case at bar the plaintiff was an ordinary laborer, thoroughly understanding the work he was employed to do, working under the supervision, order and directions of Butler, his foreman, who had complete charge and control of both the work being done and of the plaintiff and the other linemen. Neither the plaintiff nor any of his fellow linemen had any right or authority to decide what poles were sound or unsound, or which poles were to stand or which ones were to be removed, nor did they have any discretion whatever as to the mode or manner in which the work was to be done.

Under the state of facts disclosed by this record, the defendant was clearly liable for all injuries sustained by plaintiff because of the failure of Butler to properly inspect and point out to him the defective and dangerous condition of the pole on which he was injured.

But independent of the foregoing observations touching the duties and obligations defendant owed its employees, this record abounds with evidence tending to show, and the jury so found, and properly so in our opinion, that there was no custom or general understanding existing between the defendant and its line-

men to the effect that the latter were to do their own inspection of the poles, cross-arms and wires, and thereby relieve the former from the performance of these duties, as well as to incidentally release the defendant from liability for damages for its negligence in failing to furnish him a reasonably safe place in which to work. So, if we take either horn of the dilemma thus presented, the plaintiff made out a prima facie case for the jury, and the court properly refused the peremptory instruction asked by the defendant at the close of the introduction of all the evidence to find for it.

II.   Counsel for the defendant next complain of the action of the trial court in giving instruction numbered one on behalf of plaintiff. That instruction in effect told the jury that the plaintiff could recover even though he knew of the defective condition of the pole, unless it was of such a glaring character as to threaten imminent danger. This instruction correctly declared the law to the jury, which is shown by the numerous decisions of this court, the last one of which is George v. Railroad, 225 Mo. 367.

If that is not the law, then the defendant might find it difficult, if not impossible, to reconstruct this dilapidated telephone plant, for the reason that all the employees knew that the poles and cross-arms were being taken down and new ones erected in their places because of their defective condition; and to hold because of that knowledge the employees had no right to make the repairs except at their own risk, then the company might and in all probability would be unable to secure laborers to do that work, especially when we consider the fact that they have no discretion as to the mode or manner of doing the work. But if upon the other hand the employees saw no glaring dangers, they might very well conclude that they with due care could work there without injury to themselves, especially when they knew the defendant was inspecting the poles,

and the law made it the duty of the company to notify them of all unglaring dangers which might exist and which could have been discovered by a reasonable inspection. But be that as it may, the instruction correctly stated the law, and the court did not err in giving it.

III. It is insisted by counsel for the defendant that the sixth instruction given for the plaintiff is erroneous, for the reason that it authorized the jury to allow the plaintiff damages for the loss of time and wages, past and future, while the petition does not ask for such allowance.

Taking a superficial view of this insistence one might assume it was based on merit, but when we look at the substance of and the clear meaning of the instruction and petition, that apparent discrepancy entirely disappears and leaves no semblance of a substantial base upon which to rest. By reading the allegation of the petition touching this matter it will be seen that it in substance states that at the time of the injury the plaintiff was a young man of twenty-seven years of age, possessed of full strength and vigor, and was earning three dollars a day; that but for said injuries he would have continued to earn that sum; and that as a result of said injuries his ability to earn a livelihood had been lost or greatly impaired; and that in consequence of said injuries he has lost and will continue to lose his time from his work and his earnings. The final prayer of the petition is for $36,000. There can be no question but what these allegations are sufficiently broad to include the loss of time and wages. But in order to negative this construction of the petition, counsel for defendant contend that this construction is contradictory of those charges of the petition which state that the plaintiff's damages sustained on account of his *personal* injuries was $35,000. (Then follows the charge of loss of time and wages before stated.) And that his doctor, medicine and nurse bills amounted to $1000,

aggregating $36,000, the sum for which judgment is asked.

This contention is untenable, for the reason that the prayer for judgment does not specify the elements of damage for which judgment is asked. It reads as follows: "Wherefore, plaintiff prays judgment against the defendant in the sum of thirty-six thousand dollars and costs of suit." This prayer no more refers to the allegations regarding the doctor bills incurred and *personal* injuries sustained than it does to the charge of loss of time and wages. It is general in terms and includes all the elements of damages sustained and sued for, and not only a part of them. The mere fact that the amount asked for in the prayer of the petition happened to equal the amount which plaintiff stated he had been damaged on account of the *personal* injuries he had received and doctor bills incurred does not militate in the least against the conclusion that the prayer is broad enough to cover all of the elements of damages sued for, including the loss of time and wages. Suppose instead of the prayer asking for a judgment for $36,000, as it does, it had asked for only $20,000, then would or could it have been seriously contended that plaintiff would thereby be precluded from showing by the evidence that he had incurred doctor bills to the extent of one thousand dollars and that he had been incapacitated to earn wages, and from asking an instruction telling the jury that they might allow him therefor? Certainly not. The only effect the supposed prayer would have had would be to preclude plaintiff from recovering more than $20,000 for all his injuries, and would not have deprived him of the right to have the jury pass upon all of the elements of damages sustained. But counsel for defendant may suggest that such a construction would have the effect of expunging from the petition the allegations thereof fixing the amount of the damages sustained by plaintiff on account of the *personal* injuries alleged to have been sus-

tained and the doctor bills charged to have been incurred. If that were conceded to be true, it would expunge only immaterial allegations, namely, "to his damage in the sum of $35,000," and "in the sum of $1000." If both of these allegations were literally stricken from the petition, the cause of action therein stated would not be changed in the slightest iota, for the reason that the prayer for $36,000 would then, as now, include all the elements of damage sued for. But, upon the other hand, what effect would defendant's insistence have upon the petition if sustained? It would have the clear effect of striking from the petition all of the allegations regarding plaintiff's loss of time and wages, which is one of the principal elements of damages sustained by him.

Clearly it was not the intention of the pleader to waive this important element; and when we read the allegations of the petition, touching this matter, we are unable to see how any fair-minded, disinterested person can seriously contend that the petition does not ask for the damages sustained on account of loss of wages.

This insistence is untenable, and we rule it against defendant.

IV.   We are next requested to reverse the judgment of the circuit court for the reason that counsel for the plaintiff offered in the presence of the jury to show by defendant's witness, Craiglow, the following:

"Did you, at Fort Scott, Kansas, at the Goodlander Hotel, after Corby was injured, at a time when you sent for him to come down to Fort Scott for treatment, and you were talking with him about his condition, and in reply to a suggestion on the part of Corby, that the doctor said he never would be better, that the witness Craiglow then said to him: 'If I was not in the employ of this company, I could show you how you could help yourself?' "

The objection to this offer was made in the following language, as appears by this record:

"The defendant objected to the testimony being proven or attempted to be proved, for the reason that the same is incompetent, immaterial and irrelevant and misleading in its effect, and no part of the *res gestae,* and it was made by a person in no position to bind the company."

The meaning of this objection is not perfectly clear to our minds, but we suppose counsel was objecting to plaintiff's proving or attempting to prove the statement purporting to have been made by Craiglow to plaintiff. The court sustained this objection and plaintiff duly excepted.

Before this offer to prove what Craiglow is purported to have said was made, Craiglow, the defendant's foreman, who had charge of this entire work, had been placed upon the witness stand by the defendant and had testified fully upon every phase of the case; and his testimony tended to fully support the theory of the defense and to sharply contradict that of the plaintiff. While the record does not disclose the purpose counsel for plaintiff had in offering to prove what Craiglow said, yet we presume it was for the purpose of impeaching his testimony given on behalf of defendant.

But whatever may have been the purpose, we have no right to assume, as counsel for defendant have, that it was for the purpose of misleading and prejudicing the jury against the defendant. Counsel for defendant did not so indicate in his objection made to the offer, nor does the record anywhere indicate any such purpose or intention. The most logical view to be taken of the matter is that counsel for plaintiff must have thought that the statement, if made by Craiglow, in some manner tended to contradict his testimony previously given, and offered to prove he made it for the purpose of impeaching him. This he had a perfect right to do. But independent of all this, the court sustained defendant's objection and excluded the testi-

mony offered from the jury, and under that condition of the record we are unable to see in what possible way defendant was injured by the offer.

We therefore decline to disturb the judgment on that account.

V.    Defendant asked the trial court to give instructions marked A, B, and C and D and E.

The one marked A was the peremptory instruction, asked at the close of all the evidence, telling the jury to find for the defendant. That is the instruction referred to and disapproved of by us in the first paragraph of this opinion; and consequently is deserving of no further consideration.

Counsel for defendant do not in their brief complain of the action of the trial court in refusing instructions marked B, C, D, and E, and we suppose they have been abandoned; but apprehensive that this may have been the result of oversight, we have carefully read them in the light of the issues joined by the pleadings, the evidence introduced by the parties and the instructions given by the court for both plaintiff and the defendant, and have been unable to discover any error in the action of the court in refusing to give them. They are substantially covered by those given, and the features thereof not embraced by those given do not properly declare the law applicable to the facts of the case, and were properly refused.

VI.    Counsel finally insist that the judgment is excessive. We are unable to lend our concurrence to that insistence. We have never read of a case where a person was more seriously injured than plaintiff was, and survived. His physical pain and mental anguish were almost intolerable. He was cut, bruised and wounded over various parts of the body, the lower part of his spine was broken, and he received various internal and external injuries of a permanent character; and it is scarcely denied but what he is completely and hopeless-

ly paralyzed from the hips down, which renders him absolutely dependent and helpless.  His capacity to earn a livelihood is practically, if not totally, destroyed; and in consequence thereof he has lost his health, strength and vigor, and has been practically deprived of all the comforts, joys and pleasures of life, save and except such as this $22,500 judgment will purchase for one in his deplorable and miserable condition.

What hale, hardy and vigorous young man would exchange place with him in consideration of $22,500, or where is the disinterested, unbiased man who will say the judgment is excessive? This court has approved judgments for larger amounts in similar cases where the injuries were no greater.

Finding no error in the record, the judgment, in our opinion, should be affirmed and it is so ordered.

*Valliant, J.,* concurs; *Lamm, P. J.,* and *Graves, J.,* dissent.  There being no opinion, the cause is transferred to Court in Banc.

PER CURIAM.—This cause having been transferred to Court in Banc upon the dissent of two of the judges, was there reargued, and after due consideration the opinion of WOODSON, J., hereinabove reported, handed down in Division No. 1, was adopted by the court as the opinion thereof.

The judgment is affirmed. *Valliant, C. J., Gantt, Woodson* and *Kennish, JJ.,* concurring; *Lamm* and *Graves, JJ.,* dissenting; *Burgess, J.,* not sitting.