FRANK W. RUTLEDGE v. E. W. SWINNEY et al.,
Receivers of SEDALIA LIGHT & TRACTION
COMPANY.

**Division Two, July 14, 1914.**

1. **NEGLIGENCE: Pleading: Defective Cross-Arm: Designed to Support Lineman.** Although the petition does not categorically aver that the cross-arm upon which plaintiff was resting a part of his weight while attempting to remove a transformer from an electric light pole and to replace it with a larger one, was intended to support his weight while he was performing that work, yet if it alleges that fact with sufficient clearness to notify the defendant company that the rotten condition of the cross-arm was the cause of his falling, defendant, having neglected to demur or to move to make the petition more definite, will not be heard to complain, after verdict, that the petition was insufficient in that respect.

2. ————: **Defective Cross-Arm: Inspection: Facts of Case.** Plaintiff was directed to assist defendant's foreman and two other employees in removing from the cross-arm of an electric light pole a transformer and replacing it with a larger one. Some of the poles had become rotten at the ground, and many of the cross-arms used to support wires and transformers were defective and had to be replaced with new ones. After the old transformer was lowered to the ground and a new one raised and hung upon the cross-arm, plaintiff, whose duty it was to connect and solder several wires and in doing which it was necessary for him to go both above and below the transformer, on account of the position of numerous wires was compelled to unfasten his belt from the pole and climb over the transformer, and in doing so was unable to secure a hold upon the pole with his hands, but was compelled to sustain himself by taking hold of the cross-arm from which the transformer was hanging. The cross-arm appeared sound, but a short distance from the pole it was sound only at the exterior, the interior being rotten, so that when plaintiff placed a part of his weight upon it it broke, and its decayed condition was the immediate cause of his fall. Plaintiff's testimony is to the effect that it was not his duty to inspect poles or cross-arms; that the foreman had recently been going over the system and inspecting them, and required plaintiff and other employees to replace with new ones those found to be decayed; that a new cross-arm had recently been placed above the one that broke; that the work was a "rush job"

Rutledge v. Swinney.

and plaintiff was not furnished with tools for inspecting cross-arms, which could be properly done only with a hand ax or hammer and chisel; and that he looked and saw that the cross-arm which broke appeared to be sound. It was apparently necessary for him to remove his belt from the pole, and he is not charged with negligence in that respect. *Held*, that a reasonable degree of care would have led the foreman to have carefully inspected the cross-arm, or to have furnished plaintiff with suitable tools and instructed him to inspect it before installing the transformer, and the case was one for the jury.

3. ————: ————: **Disregarding Evidence.** Unless the testimony on which the verdict rests is so utterly at variance with the admitted or known physical facts as to require it to be cast aside, it will not be disbelieved by the appellate court.

4. ————: ————: **Opportunity of Inspection.** Where there was evidence that the work of replacing the transformer with a new one, on the decayed cross-arm, was a "rush job" and that the lineman was not furnished with tools for inspecting the cross-arm, it was not error for the instruction to include, as an element of his right to recover for injuries caused by the breaking of the cross-arm, that he "did not have the opportunity, time and means to discover the condition of the cross-arm."

5. ————: **Instruction for Defendant: No Evidence.** It is not error to refuse an instruction for defendant if there is no sufficient evidence upon which to base it. If the evidence does not tend to establish a custom among the defendant's linemen of inspecting cross-arms before they went upon them, it is not error to refuse an instruction basing a defense upon such custom.

6. ————: ————: **Refused Covered by Those Given.** It is harmless error to refuse an instruction for defendant whose theory of defense is covered by others given. Even though it be conceded there was slight evidence to support an instruction telling the jury that if it was the duty, under the system of employment adopted by defendant, for each lineman to inspect cross-arms before going upon them, any error in refusing that instruction was cured by another given telling the jury that even though linemen frequently placed their weight upon cross-arms, it was plaintiff's duty, before placing his weight upon the cross-arm in question, to exercise ordinary care to ascertain whether it was adequate to bear his weight, and if he failed to exercise such care he could not recover.

261Mo9

7. **EXCESSIVE VERDICT: $9000.** Plaintiff, a strong man twenty-nine years old, with large experience in handling and repairing electrical appliances and in doing signal work on railroads, earning at the time of his injury $65 per month and prior thereto as much as $85, while engaged in substituting on a cross-arm of an electric light plant a transformer with a larger one, fell to the ground, breaking a bone at the elbow, which has never been removed, and so tearing loose the muscles from the bone as to render that arm useless. One of his ears was so injured internally that he has lost the power to hear through it; the muscles of one side of the body are withered and atrophied, which has given him a lop-sided appearance; his general health has declined, and his weight been reduced. from 152 to 121 pounds; the pains produced by the injuries were so great that within a few hours his reason was temporarily dethroned, and the pains continued for two weeks; and whether or not the loose bone in the arm can be so treated or operated upon that he can again use the arm, is left in doubt by the testimony of the physicians. *Held,* that a verdict for $9000 is not excessive.

Appeal from Pettis Circuit Court.—*Hon. Hopkins B. Shain,* Judge.

AFFIRMED.

*George F. Longan* and *Seddon & Holland* for appellants.

(1) The court should have given the peremptory instruction asked by appellants at the close of all the evidence, because the petition does not state a cause of action, in that it does not allege that the cross-arms and pins referred to in respondent's petition were furnished for the purpose of bearing the weight of linemen, or that respondent, while using same, was acting in the discharge of his duties. Roberts v. Tel. Co., 166 Mo. 369; Telephone Co. v. Speicher, 117 Mo. 405; Sindlinger v. Kansas City, 126 Mo. 355; Kelly v. Lawrence, 195 Mo. 75; Flood v. Tel. Co., 131 N. Y. 603. Because there was no testimony that the cross-arms and pins in question were furnished for the purpose of bearing the weight of linemen. Because it was the duty of respondent to make his own inspection. The

evidence in this case shows that had he made a proper inspection, he would have discovered that the cross-arm and pins in question were weak on account of internal decay and would not sustain his weight. Smith v. Light & Power Co., 143 Mo. 572; Forbes v. Dunnavant, 198 Mo. 193; McIsaacs v. Lighting Co., 172 Mo. 89. (2) The court erred in giving instruction number 11 at the instance of respondent, for the following reasons: (a) Because it provides for a recovery if the jury believe that the cross-arms on the pole in question and the pins thereon were in a defective and unsafe condition, without requiring any finding that they were designed or furnished to sustain the weight of linemen, or any finding that the respondent, in placing his weight on same, was acting in the discharge of the duties of his employment. Coyne v. Railroad, 133 U. S. 370. (b) Because it overlooks the direct testimony offered by appellants to the effect that it was the duty of each lineman to act as his own inspector. (c) Because, if respondent did not have the means at hand to make an inspection, he should have acquired them. (d) Because, in part, it is predicated on matters in regard to which there was no testimony, to-wit, that part in which a finding is required that plaintiff did not have opportunity, time or means to discover the condition of the cross-arm in question. (3) The court erred in refusing to give instruction 3 at the instance of appellants. Said instruction is amply supported by the evidence, correctly states the law and should have been given. (4) The court erred in refusing to give instruction number 5 at the instance of appellants. Said instruction correctly states the law and should have been given.

*Montgomery & Montgomery* and *Charles E. Yeater* for respondent.

(1) It was not necessary for a recovery by plaintiff to either plead or prove that the cross-arms and

pins were furnished for the purpose of bearing the weight of linemen. The petition alleges that the cross-arm was a part of the place where the plaintiff had to work and that in order to complete his work he had to put his hand thereon in changing his position and that by reason of its defective condition, due to internal rot, which defendant could have ascertained by proper inspection, but which was not obvious, or apparent to the senses, plaintiff fell and was precipitated to the brick sidewalk below, while engaged on a rush job with neither time nor tools to inspect with. The evidence is undisputed that it was impossible for plaintiff to ascend the pole without using the cross-arms and that putting his hand on the cross-arm while undoing his safety belt and starting to climb the pole was an act absolutely necessary in order to make the ascent; and the evidence is also undisputed that all linemen customarily every day use the cross-arms in their work and in climbing; and defendants proved that linemen put their weight on the pins, and that the foreman, after plaintiff's fall, put the entire weight of his body on the very cross-arm in question in finishing the work. It is also undisputed that this cross-arm was not used for carrying wires, but for the purpose of supporting the iron transformer. The courts have held as a matter of law that cross-arms must be and always have been used by linemen as a means of support and that it is the duty of the master, aside from exceptional cases, to inspect them, so that they may be sufficient to meet the requirements of such use. Rutledge v. Swinney, 170 Mo. App. 251; McDonald v. Tel. Co., 22 R. I. 131; Clairain v. Tel. Co., 40 La. Ann. 178; Telegraph Co. v. Cloman, 97 Mo. 620. (2) The fact that plaintiff grabbed the pins in the act of falling is entirely immaterial as that had nothing to do with the defective condition of the cross-arms which had previously shelled off under the grasp of his left hand. Clutching in desperation the pins, like a drowning man

grasping at straws, was merely the act of a person falling and in imminent danger of great bodily injury acting on the natural impulses of the instinct of self-preservation, and cannot be condemned. Plaintiff, however, could legally use the pins for a support by his hands in climbing. Rutledge v. Swinney, 170 Mo. App. 251; Chisholm v. Tel. & Tel. Co., 185 Mass. 83. (3) Conceding that cross-arms on a pole, and the pole itself are primarily intended only for carrying wires, they are suitable for the use of the linemen in steadying themselves in climbing and working on the poles and the undisputed evidence, including that of defendants, shows that they are so used, and it is self-evident that the master knows that they must be so used, and therefore, the contention of appellants in their brief, that plaintiff must be held negligent in law from the mere fact that he attempted to use the cross-arm in making his ascent, is unsound and erroneous, and defendants' given instruction 9 was more favorable than they were entitled to. Rutledge v. Swinney, 170 Mo. App. 251; Brimer v. Railroad, 109 Mo. App. 493; Palmer v. Kinloch Tel. Co., 91 Mo. App. 115; Winscott v. Railroad, 151 Mo. App. 378; Chisholm v. Telephone Co., 185 Mass. 83. (4) It was not the duty of the plaintiff to make a comprehensive inspection on his own motion, of the pole or its attachments for hidden or latent defects, and under the law of master and servant he was bound only to make such a casual inspection of obvious defects as were apparent upon the surface, and this duty the defendants could not impose upon the plaintiff by virtue of any rule, custom or understanding, or by refusing to assume the duty; and since the trial court instructed the jury by instruction B, given on the motion of the court, that unless the defendants had assumed the duty of inspection for hidden or latent defects, it was the duty of plaintiff to make his own inspection, in order that he might ascertain any and all defects that might make the cross-

arms unsafe to him, whether said defects were obvious or hidden, it is therefore apparent that such instruction was unduly favorable to defendants and put an unfair burden upon the plaintiff.   Corby v. Tel. Co., 231 Mo. 436; Knorpp v. Wagner, 195 Mo. 662; Nicholds v. Plate Glass Co., 126 Mo. 64; Hysell v. Swift & Co., 78 Mo. App. 43; Porter v. Railroad, 71 Mo. 78; Epperson v. Tel. Co., 155 Mo. 384; Lee v. Railroad, 112 Mo. App. 402; Doyle v. Trust Co., 140 Mo. 18; Rigsby v. Supply Co., 115 Mo. App. 308; Benton v. Railroad, 32 Mo. App. 458; Covey v. Railroad, 86 Mo. 641; Corey v. Railroad, 27 Mo. App. 179; Flynn v. Bridge Co., 42 Mo. 531; 26 Cyc. 1213.

BROWN, J.—Plaintiff sues for injuries sustained while working for defendants as a lineman.   Defendants are receivers of the Sedalia Light & Traction Company.

This is the second appeal in this case.   On the first trial plaintiff obtained a judgment of $5000, which was reversed by the Kansas City Court of Appeals on account of erroneous instructions.   [170 Mo. App. l. c. 265.]   Upon a second trial plaintiff had judgment for $9000, from which defendants appeal to this court.

The plaintiff sustained his alleged injuries by falling twenty-one feet from an electric light pole upon a brick sidewalk.   The nature of his injuries will be noted in connection with our conclusions.

The plaintiff, on the afternoon of February 8, 1912, was directed to assist defendants' foreman Gus Bergfelder and two other employees in removing a Horneberger transformer from a pole and replacing same with a larger transformer known as a General Electric.

The lighting plant for which defendants were receivers had been constructed several years.   Some of their poles had become rotten at the ground, and many of the cross-arms on their poles used to support wires

and transformers were also defective and had to be replaced with new cross-arms. Defendants had ordered all of their "Horneberger" transformers replaced with "General Electrics." The latter is described as being a larger transformer than the Horneberger. The sizes and weights of these transformers are not stated in the evidence or pleadings, and, while some originals and models were introduced, and the trial court and jury may have obtained a correct knowledge of their respective sizes, it is somewhat difficult for us to do so from the printed record.

The immediate cause of plaintiff's fall was the decayed condition of part of a cross-arm upon which he was installing a new transformer. He testifies that after the old transformer had been lowered to the ground and the new transformer raised and hung upon the cross-arm, it was his duty to connect, paint and solder several wires; in which work it was necessary for him to go both below and above the transformer. That, on account of the position of numerous wires, he was compelled to unfasten his belt from the pole and climb over the transformer; in doing so he could not secure a hold upon the pole with his hands, but was compelled to sustain himself by taking hold of the cross-arm to which the transformer was hanging. There is no dispute about the fact that the cross-arm appeared sound, and may have been sound where it was fastened to the pole, but a short distance from the pole it was only sound about a fourth of an inch deep, and the interior was so rotten that it crumbled or sloughed off under plaintiff's weight, or such of his weight as he placed upon it with his hand.

Plaintiff testified that he was performing a "rush job," commenced about three p. m. That he was instructed by the foreman to complete the job so as not to interrupt the service to some nine customers who obtained lights through this particular transformer. According to plaintiff's evidence it required about

three hours to take down an old transformer and replace it with a new one, many wires having to be connected, soldered and painted and other appliances changed. That after arriving at the pole they had less than two hours to complete the job, the lights being needed about 4:30 on that short February day. Plaintiff further testified that this pole stood in a leaning position, but that it was not his duty to inspect poles or cross-arms, and that Mr. Bergfelder, defendants' foreman, had recently been going over defendants' lighting system inspecting the cross-arms with a hammer and chisel; that by this method he detected many cross-arms which were decayed, and caused plaintiff and other employées to replace such defective cross-arms with new ones. That he was told not to inspect, and was not furnished with tools suitable for that purpose. That the only proper tools for inspecting cross-arms were a hand axe or hammer and chisel; that, while the foreman kept a hammer and chisels locked in a box at defendants' office with which he inspected cross-arms, in directing what tools and appliances should be taken to the place where plaintiff was injured, said foreman omitted the hammer and chisel.

Plaintiff further testified that in the morning of the day he was injured he assisted defendants' foreman in taking down a Horneberger transformer and hanging a larger one in its place in another part of the city; that before making that change defendants' foreman climbed the pole and inspected with hammer and chisel the cross-arm upon which the new transformer was to be hung. Plaintiff also testified that because he had been told not to inspect, because no tools suitable for that purpose were furnished or taken to the place of the accident, and because the pole where he undertook to hang the transformer contained a new cross-arm near the top thereof, he supposed defendants' foreman had recently inspected that pole and the cross-arms thereon, and, consequently, did not un-

dertake any inspection except with his eyes. That he looked and saw that the cross-arm upon which the new transformer was to be hung appeared to be sound. There were four cross-arms on the pole; the transformer was hung on the second one from the bottom.

Plaintiff further testified that when he suggested how a certain kind of work should be done to secure the safety of employees, defendants' foreman said: "When you fellows are authorized to inspect or authorized to direct work, then we will do the way you want it done . . .; until then you will do what you are told to do."

George Green, a witness for plaintiff, stated that he worked for defendants under Mr. Bergfelder, the foreman, for several months, quitting the job December 23, 1911, prior to plaintiff's injury on February 8, 1912. Mr. Green stated that foreman Bergfelder went about over defendants' electric light system almost every day inspecting cross-arms with hammer and chisel, and inspecting poles at the ground with a steel bar; that he ordered poles and cross-arms removed whenever he found by such inspections they were defective or rotten. That when suggestions were made by the linemen about how they thought work ought to be done, the foreman would inform them that they must "do what they were told to do." Witness stated that it was customary for the foreman to inspect poles and cross-arms before sending linemen to repair them. The defendants' attorneys did not cross-examine this witness.

C. G. Green also testified for plaintiff that he frequently saw defendants' foreman Bergfelder going over town inspecting poles, wires and cross-arms, and making notes in a small book.

David F. Webster, defendants' superintendent, testified that he never gave any orders to his linemen about inspecting, but it was the custom for each lineman to do his own inspecting of cross-arms, which

could readily be done with a pair of plyers, connectors and a screw-driver, which tools every lineman was required to furnish and carry with him. Witness said that he had never climbed any poles, and seldom knew when cross-arms were defective, except when the linemen reported them to him; and never instructed any of the employees to climb poles to inspect cross-arms, and only supposed cross-arms were repaired when they became so badly out of order that the defects could be seen from the ground. Witness gave it as his opinion that the new cross-arm near the top of the pole where plaintiff received his injuries was placed there about two weeks before the injury occurred. Mr. Webster also stated that he appointed Mr. Bergfelder foreman of defendants' lighting plant, but could not remember if this was before or after plaintiff was injured.

Gus Bergfelder, testifying for defendants, stated that he was not foreman for defendants at the time plaintiff was injured; was simply a lineman, the same as plaintiff, but, being the oldest in the employ of defendants, the orders were given to him by superintendent Webster, and he (Bergfelder) looked after seeing that the work was performed. Mr. Bergfelder further testified that he had never climbed any poles for the purpose of inspecting cross-arms with hammer and chisel. That it was the custom for each lineman to inspect cross-arms as he needed to use them, which could readily be done by tapping them with plyers, connectors or a screw-driver, which tools each lineman carried. Witness further stated that the new cross-arm near the top of the pole where plaintiff was injured was placed there in September, 1911. That after plaintiff's injury witness climbed the pole and, within a few minutes, completed the installation of the new transformer, standing on the transformer while he did that work. That he thought an hour was sufficient

time to take down a Horneberger and install a new transformer.

There is not much conflict in the evidence as to what tools a lineman was required to supply and carry with him—a pair of plyers, connectors and a screwdriver, or a knife with a stub or broken blade, the knife being used in stripping wires and unscrewing fixtures on transformers.

Lucian Brewington, who had worked for defendants, and who was introduced by them as a witness, testified that he knew of no custom of inspection on defendants' plant. Said witness further testified that striking a cross-arm with a pair of plyers or connectors would not ordinarily afford much information as to whether it was sound. He usually inspected cross-arms either by shaking them or by driving his screwdriver into them with a hammer, if he had the hammer. When a cross-arm looked sound he ordinarily went ahead and used it without inspection.

Frank Leach, an electrician and lineman of large experience, stated that cross-arms could not be satisfactorily inspected with plyers or connectors. If a cross-arm was dry and hollow that fact might be detected by tapping it with plyers, but if the inside of the cross-arms was simply rotten and full of moisture, and wires were strung upon it, its unsoundness could not be detected by tapping it with a light instrument. In such cases the proper inspection could only be made with a hand axe or with a hammer and chisel.

Such additional facts as may be necessary to a full understanding of the case will be given with our conclusions.

## OPINION.

I. The first point relied upon by defendants for reversal is that the plaintiff's petition is insufficient, in that it does not charge that the cross-arm which crumbled or sloughed off under

Petition.

plaintiff's hand causing his fall and consequent injuries was designed or intended to support the weight of a lineman. The petition contains the following averments.

"And plaintiff avers that it was the duty of the defendants, through their officers, agents, and foremen, to exercise ordinary care in inspecting their poles, cross-arms, pins and wires, and other places where their workmen would have occasion to work, so as to ascertain whether such places were ordinarily safe for said workmen thereat engaged in their said work, but that 'the defendants wholly failed to discharge such duty of inspection so incumbent upon them with reference to the said pole situate as aforesaid at the intersection of said Vermont avenue and Second street in the city of Sedalia.

"And plaintiff says that the cross-arms upon said pole and the pins sunk therein were defective, unsafe and dangerous, and that the defendants, knew, or, in the exercise of ordinary care and diligence, should have known of such defective, unsafe and dangerous condition, and should have remedied the same by the necessary repairs so as to make the same safe for workmen engaged in the work of defendants thereon; and plaintiff also says that the plaintiff had no knowledge whatever of the defective, unsafe and dangerous condition of said pole, cross-arms and pins."

While this petition does not categorically aver that the cross-arm in question was intended to support plaintiff's weight while he was hanging the transformer, it alleges that fact with sufficient clearness to notify defendants that the rotten condition of the cross-arm was the cause of plaintiff's injury. It recites that it was the duty of defendants to inspect their cross-arms and make the same safe for employees to work thereon. This recital is equivalent to averring that it was necessary and intended that linemen should go upon the cross-arms in performing their work. The

defendants having neglected to either demur or move to make the petition more definite cannot, under the facts in this case, be heard to complain after verdict. [Sexton v. Metropolitan Street Ry., 245 Mo. 254, l. c. 262-263; Parker v. United Railways, 154 Mo. App. 126.]

The answer of defendants is a general denial and a general plea of contributory negligence.

There is a recital in the petition that the pins in the cross-arms were defective, but that part of the petition should be treated as surplusage. The evidence shows that plaintiff did not touch the pins until the cross-arm itself crumbled and gave way. He then caught hold of two of the pins in the cross-arm to avoid falling, but those pins broke or pulled out. It was the decayed condition of the cross-arm, not the pins, which caused plaintiff to fall.

The case of Roberts v. Missouri & Kansas Telephone Co., 166 Mo. 370, is not "on all-fours" with the case at bar, as defendants assert. In the Roberts case the plaintiff was not relying upon someone else to inspect. He seems to have had the time, tools and opportunity to inspect, but neglected to do so. It further appears that Roberts had actual knowledge that the cross-arm upon which he stepped was defective, because he saw that one of the pins was decayed and had broken. Yet, notwithstanding that knowledge, without fastening his belt to the pole, he stepped out on the cross-arm two feet from the pole. In the case at bar there was nothing in the outside appearance of either the cross-arm or pins to indicate decay or hidden defects. It is true that Roberts, like the plaintiff here, released his belt from the pole, but plaintiff states that he had to do so in order to shift his position and climb over the transformer and numerous wires. The defendants do not assert that plaintiff was guilty of any negligence in removing his belt from the pole. It was apparently necessary to do so. The case of Corby

v. Mo. & Kan. Tel. Co., 231 Mo. 417, while not "on all-fours" with this case, furnishes strong support for respondent's contention.

The size of the particular cross-arm which crumbled under plaintiff's hand is not given, except through a model which is not before us, but it does appear that said cross-arm was strong enough at the pole to hold up the old transformer and also the new one, and if it appeared to be sound it was perfectly natural for plaintiff to suppose that it would sustain his weight a few inches from the pole where he took hold of it.

The putting up of a larger transformer caused greater pressure upon the cross-arm than it had theretofore borne, and only a reasonable degree of prudence on the part of Mr. Bergfelder, the foreman, would have caused him to inspect the cross-arm carefully, or to have furnished plaintiff with suitable tools and instructed him to inspect it before installing the larger transformer.

Cases may arise where a lineman would be guilty of contributory negligence in placing his weight upon a cross-arm without first fastening his belt to the pole, but this is not one of them.

II.   Counsel for defendants make a strenuous effort to convince us that the jury should have believed their witnesses and disbelieved those who testified for plaintiff, including the plaintiff himself.

**Evidence.**   There are cases where the testimony of witnesses is so utterly at variance with the admitted or known physical facts as to justify casting such evidence aside (Stafford v. Adams, 113 Mo. App. 717); but this is not a case of that kind. James Green, who corroborates plaintiff most fully as to defendants' custom in regard to inspections, and consequently contradicted the evidence of defendants' witnesses Bergfelder and Webster, made a very straightforward statement, and was not even cross-examined by de-

fendants' attorneys. So far as the evidence is concerned, we will say that defendants' demurrer thereto was wholly frivolous, and if there was no point in the case except the alleged insufficiency of the evidence we would feel it our duty to affirm the judgment with ten per cent damages, as provided by section 2084, Revised Statutes 1909.

III. We will next consider the issues arising on the giving and refusal of instructions.

**Plaintiff's Instructions.** A most earnest complaint is made against plaintiff's instruction number 2, which reads as follows:

"The court instructs the jury that if they believe from the evidence that on the 8th day of February, 1912, the plaintiff, Frank W. Rutledge, was engaged in the line of his duty as a lineman for the defendants and in the performance of such duty was engaged in the work of replacing a small transformer with a larger transformer to meet increased service on defendants' pole at the northwest corner of Second and Vermont streets in the city of Sedalia, and was engaged in said work with other workmen under the supervision and control of defendants' foreman and subject to his orders and control, and if you believe from the evidence that the second bottom cross-arm on said pole and the pins on the north end thereof were in a defective and unsafe condition for linemen working thereon, and that at said time such condition of the same was known, or by the exercise of ordinary care could have been known by the defendants, and if you believe that from the nature and character of the work, the plaintiff did not have the opportunity, time or means to discover the condition of said cross-arm, then your verdict must be for the plaintiff, provided you further find and believe from the evidence that the plaintiff was in the exercise of ordinary care at that time and received damages as the result thereof."

Plaintiff testified that he was required to perform a rush job and not furnished tools with which he could have detected the decayed and unsafe condition of the cross-arm. Consequently there was substantial evidence that he did not have "the opportunity, time and means" to discover the condition of said cross-arm as recited in the instruction under consideration. The weight to be given plaintiff's evidence is an issue which was foreclosed by the verdict of the jury. [Dutcher v. Railroad, 241 Mo. 137, l. c. 168.] The giving of this instruction did not constitute error.

The ninth instruction given at the request of plaintiff is much like instruction number 2, and reads as follows:

"The court instructs the jury that if they believe from the evidence that the plaintiff was sent up the pole in question by defendants' foreman under circumstances that deprived him of the means and opportunity of inspecting the cross-arm for latent defects and if they believe that the foreman in ordering him to the top to do a rush job knew that plaintiff had neither the means or time for a comprehensive inspection, and that plaintiff's fall was due to a latent or hidden defect in the second cross-arm from the bottom, then the plaintiff had a right to presume from such orders and action of the foreman that the pole and its attachments had been recently inspected and found to be in good condition, and that the cross-arm was reasonably safe for the use the foreman must have anticipated he would make of it."

The two instructions above quoted furnish a fair outline of plaintiff's theory of the case.

IV. The court refused the following instruction requested by defendant:

"The court instructs the jury that if you believe and find from the evidence that on February 8, 1912,

Refused
Instructions.

and for some time prior thereto plaintiff was in the employ of defendant as a lineman and that under the system of work adopted by defendant for linemen it was the duty of plaintiff, before he climbed a pole or rested his weight upon a cross-arm, to make a careful inspection to ascertain whether such pole or cross-arm was sufficient to sustain his weight before placing his weight thereon, then and in that case the plaintiff is not entitled to recover and you will find your verdict for the defendant.''

It is very doubtful if there was sufficient evidence upon which to base this instruction. The defendants' superintendent, Mr. Webtser, stated the he gave no orders to his linemen about inspecting. From Mr. Webster's evidence it seems that he thought it unnecessary to inspect or take down cross-arms until their unsafe condition became so obvious that it could be observed from the ground. He seems to have regarded inspections as a matter of little moment. Mr. Bergfelder, the foreman, testified that it was the custom among defendants' employees for each lineman to inspect cross-arms before going upon them, yet Mr. Bergfelder gave no instance of this custom being observed, and admitted that, without an inspection, he himself stood upon the transformer while it was hanging on the very cross-arm, a part of which had crumbled in plaintiff's hand, causing him to fall. Notwithstanding Mr. Bergfelder knew this cross-arm was badly decayed he seems to have depended upon it to hold up both himself and the transformer.

Lucian Brewington, another witness introduced by defendants, stated that when a cross-arm looked sound he ordinarily went upon it without further inspection. It is difficult to see how a system or custom of inspection could come into existence or be adopted which was not prescribed by any rule of defendants, and

261Mo10

seldom, if ever, practiced by any of its employees.
From the evidence it is certain that the decayed con-
dition of the cross-arm which caused plaintiff's fall
could not have been discovered from the ground, and
a strong preponderance of the evidence tends to prove
that its defects could not have been ascertained with-
out the aid of a hammer and chisel or hand axe.

V. . Yet if it be conceded that instruction number
3 requested by defendants should have been given, we
think its refusal was harmless, because
**Instructions**
**Sufficient.**    defendants' theory of the case was prop-
erly presented to the jury by other in-
structions.    Instruction number 7 given at the request
of defendants, reads as follows:

"The court instructs the jury that even though
you believe and find from the evidence that linemen
frequently placed their weight on cross-arms, yet it
was the duty of plaintiff, before placing his weight,
or part thereof, on the cross-arm in question, to exer-
cise ordinary care to ascertain whether it was adequate
to bear such weight.    And the court instructs the jury
if you believe and find from the evidence that plaintiff
failed to exercise such care, and that had he done so
he would have discovered that the cross-arm in ques-
tion was too weak to sustain his weight, or part of it,
then and in that case the plaintiff is not entitled to
recover and you will find your verdict for the defend-
ant.''

This instruction was supplemented by one given
by the court of its own motion, which reads as fol-
lows:

"The court instructs the jury that if they find and
believe from the evidence under all the instructions,
that it was the duty of plaintiff, when working upon
and about cross-arms upon poles, to make his own in-
spection, in order that he might ascertain any and all
defects that might render the cross-arms unsafe to

him, whether said defects were obvious or hidden, then the court instructs the jury that the term 'ordinary care' as having application to this duty of inspection, means such care and caution, considering all the facts and circumstances in evidence, including the elements of means and time for making a comprehensive inspection, as an ordinarily prudent person, upon whom this duty of inspection devolved, would use under the same or similar circumstances.

"On the other hand, if the jury find and believe from the evidence that the duty of inspection for hidden or latent defects in the cross-arms upon poles upon which plaintiff worked, was not the duty of plaintiff, but that said duty was assumed by defendants, then the court instructs the jury that the term 'ordinary care,' as used in these instructions and as applied to plaintiff's duty of inspection, is meant, such care and caution, taking into consideration all the facts and circumstances in evidence, including the elements of means and time for making such inspection, as an ordinarily prudent person would use under the same or similar circumstances in ascertaining obvious defects."

After a careful review of the instructions given and refused, we find that the law was correctly presented to the jury, and that defendants have no just cause of complaint on that score. [Richardson v. Railroad, 223 Mo. 325; Cytron v. Transit Co., 205 Mo. l. c. 718.]

VI. There is not much conflict in the evidence regarding the extent of plaintiff's injuries. Prior to his fall he was a strong man twenty-nine years of age, with large experience in handling and repairing electrical appliances, and doing signal work on railroads. He was earning $65 per month, and had earned as high as $85 per month. By his fall a bone was broken in one of his elbows, which bone has never been removed. The

**Judgment not Excessive.**

muscles in his arm were torn loose from the bone so as to render that arm useless. One of his ears was so injured internally that he lost the power to hear through same. The muscles of the left side of his body are withered and atrophied, giving him a lop-sided appearance. His general health has declined, and his weight reduced from 152 to 121 pounds. The pains which his injuries produced were so great that, within a few hours after his fall, his reason was temporarily dethroned. His pains continued for two weeks.

Two physicians testified for defendants that they believed the loose bone in plaintiff's elbow could be so treated by an operation that plaintiff could again use the arm, but they admitted that an operation upon a joint was more difficult than upon other parts of the body, and their evidence was not reassuring. Plain-tiff's physician testified that nothing could be done for his arm, and that his days of pole-climbing were over. The loss of hearing in one of his ears renders him unfit for signal-work on railroads. Upon this evi-dence we hold that the judgment is not excessive.

VII. The evidence of defendants' witness Berg-felder tends to prove that he was not foreman for de-fendants at the time plaintiff was injured.

**Foreman.** Bergfelder says that he gave orders and su-perintended defendants' work, "but was not duly ap-pointed foreman." Defendants seem to have aban-doned their theory that plaintiff's injury was caused through the negligence of a fellow-servant.

After a most careful review of all the evidence and authorities cited by defendants' counsel, we are convinced that the judgment should be affirmed, and it is so ordered. All concur.